807 F.2d 657
 36 Ed. Law Rep. 569
 Kalima JENKINS, by her next friend, Kamau AGYEI, et al.,
Appellants/Appellees,
and
American Federation of Teachers, Local 691, Appellant/Appellee,
v.
The STATE OF MISSOURI, et al., Appellants/Appellees,
Park Hill School District R-5 and Dr. Merlin A. Ludwig,
Superintendent thereof, et al., Appellees.
 Nos. 85-1765, 85-1949, 85-1974 and 85-2077.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Nov. 13, 1985.
Decided Dec. 5, 1986.
Rehearing Denied Feb. 5, 1987.
 
 James Liebman, New York City, and Arthur Benson, Kansas City, Mo. (on rebuttal), for Kalima Jenkins.
 Allen Snyder, Washington, D.C., for Kansas City, Missouri School Dist.
 Counsel who presented argument on behalf of appellees were H. Bartow Farr III, Washington, D.C., for State of Mo.
 George Feldmiller, Kansas City, Mo., for Consol. Suburban School Districts.
 Robert McDonald, Blue Springs, Mo., for Individual Suburban Schools.
 John Hoyle, Washington, D.C., for H.U.D.
 Michael Gordon, Kansas City, Mo., for intervenor, American Federation of Teachers.
 Before LAY, Chief Judge, HEANEY, ROSS, McMILLIAN, ARNOLD, JOHN R. GIBSON, FAGG and WOLLMAN, Circuit Judges, En Banc.*
 JOHN R. GIBSON, Circuit Judge.
 
 
 1
 This case arises from claims of unconstitutional racial segregation of school children in the Kansas City metropolitan area. After trial, the district court[1] imposed an intradistrict remedy against the Kansas City, Missouri School District (KCMSD) and the State of Missouri with the State bearing approximately three-fourths of the cost. The district court found that the KCMSD and the State had not eradicated vestiges of the racially segregated dual school system once required under state law in violation of the Constitution. The claim for interdistrict relief in the form of consolidation or realignment of the suburban school districts (SSDs) was rejected as the SSDs were found to have eliminated all vestiges of their segregated school systems and there was no finding of interdistrict violation or interdistrict effect. The SSDs were dismissed from the action. The United States Department of Housing and Urban Development (HUD) also was held not liable. In this appeal, both the KCMSD and Kalima Jenkins, the named plaintiff in a certified class of present and future KCMSD students (Jenkins class),[2] challenge the denial of interdistrict relief. The Jenkins class also appeals the judgment in favor of HUD. In addition, both the KCMSD and the State challenge the scope and the allocation of costs of the intradistrict remedy ordered against each.
 
 
 2
 The district court's findings and conclusion that the suburban school districts are not liable for interdistrict violation and may not be ordered to participate in interdistrict relief, on those issues not related to housing, are affirmed by the vote of five judges (Judges Ross, Fagg and Wollman join in this opinion; Judge Arnold concurs in the result; Chief Judge Lay, joined by Judges Heaney and McMillian, dissents).
 
 
 3
 The interdistrict findings and conclusion on the housing issues are affirmed by an equally divided court (Judges Ross, Fagg and Wollman join in this opinion; Judge Arnold files a concurring and dissenting opinion in which he concludes that the case should be remanded to the district court to consider whether there are interdistrict housing violations which would require relief; Chief Judge Lay, joined by Judges Heaney and McMillian, dissents).
 
 
 4
 The dismissal of the SSDs and HUD at the close of the plaintiff's evidence is therefore affirmed.
 
 
 5
 The intradistrict remedy ordered against the State of Missouri and KCMSD is modified in some respects with five judges concurring (Judges Ross, Fagg and Wollman join in the opinion and Judge Arnold concurs in the result; Chief Judge Lay, joined by Judges Heaney and McMillian, dissents).
 
 
 6
 This suit was filed in 1977 by the KCMSD, the School Board, and four children of two School Board members. The complaint alleged that the State, surrounding school districts in Missouri and Kansas, and several federal agencies including HUD[3] had helped cause or had been part of a system of racial segregation among Kansas City metropolitan area school districts. In October 1978, the district court dismissed the Kansas defendants for want of jurisdiction. It also concluded that the KCMSD lacked standing to bring an action against the State as party plaintiff and realigned the KCMSD as a defendant. School District of Kansas City, Missouri v. Missouri, 460 F.Supp. 421 (W.D.Mo.1978).[4]
 
 
 7
 In May 1979, an amended complaint was filed against KCMSD, and the federal and Missouri defendants named in the original complaint. The amended complaint made two distinct allegations: first, of an interdistrict violation, committed by the SSDs, and the State and federal defendants; and second, of an intradistrict violation within the KCMSD, committed by the KCMSD and the State defendants. KCMSD pursued its claim by filing, in July 1979, a cross-claim against the State, reiterating the allegation of interdistrict violation made by the Jenkins class, and seeking indemnification against any intradistrict liability.
 
 
 8
 Trial to the court commenced October 31, 1983.[5] Over the course of 64 trial days, plaintiff called over 140 witnesses, offered 2,100 exhibits, and designated approximately 10,000 pages of depositions. Before hearing evidence in response, the district court, based on standards set out by the Supreme Court in Milliken v. Bradley, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974), dismissed the eleven SSDs from the case under Fed.R.Civ.P. 41(b).[6] The court found that school districts in Missouri are autonomous and that none of the districts had committed any acts with intent to discriminate on the basis of race, to contain blacks in the KCMSD, or bar blacks from the SSDs. The court further found that within four years after Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (Brown I ), and in most cases within a shorter time, all the SSDs had eradicated the vestiges of their dual school systems and were operating unitary systems. The court further found that none of the alleged discriminatory actions committed by the State or the federal defendants had caused any significant current interdistrict segregation. The district court therefore denied interdistrict relief. See generally Order of June 5, 1984.
 
 
 9
 The district court then heard additional evidence and, on September 17, 1984, issued its order holding the State and the KCMSD liable for racial segregation of students within the KCMSD. Jenkins v. Missouri, 593 F.Supp. 1485 (W.D.Mo.1984). The court observed that before 1954, the State and the KCMSD had maintained a racially segregated dual school system. The court found, in the existence of twenty-four KCMSD schools with a black enrollment in excess of 90%, and in other areas, vestiges of the now unlawful dual school system. It therefore held that the State and the KCMSD, under principles announced by the Supreme Court in Brown v. Board of Education, 349 U.S. 294, 301, 75 S.Ct. 753, 756-57, 99 L.Ed. 1083 (1955) (Brown II ), had failed in their affirmative duty to dismantle the unconstitutional pre-1954 system. The court also held that HUD was not liable, finding that HUD had followed a balanced approach to sponsoring subsidized housing projects in both innercity and suburban areas.
 
 
 10
 On June 14, 1985, after a two-week hearing on the scope of appropriate relief, the court, 639 F.Supp. 19 (1985), issued a remedial order requiring the State and the KCMSD to fund compensatory and remedial educational programs and necessary capital improvements in KCMSD schools. The plan is projected to cost $87,000,000 over the next three years, with the State bearing approximately $67,000,000 and the KCMSD approximately $20,000,000. See Memorandum Opinion of June 14, 1985 at 41-42.
 
 
 11
 In this appeal the Jenkins class challenges the district court's dismissal of HUD, and joined by KCMSD, its dismissal of the SSDs, and its denial of interdistrict relief. The KCMSD also challenges the district court's realignment of the KCMSD as a party defendant. The State challenges the scope of the district court's remedy and the allocation of costs.
 
 INTERDISTRICT LIABILITY FINDINGS
 
 12
 In Milliken, 418 U.S. 717, 94 S.Ct. 3112, the Supreme Court held that an interdistrict remedy may not be imposed absent a finding of a constitutional violation within one district producing a significant segregative effect in another school district. Id. at 744-75, 94 S.Ct. at 3127. Without an interdistrict violation and interdistrict effect, there is no constitutional wrong requiring an interdistrict remedy. Id. Plaintiffs advanced to the district court three theories to support their claim of interdistrict violation and effect, requiring the imposition of an interdistrict remedy in the form of consolidation of the KCMSD and SSDs:
 
 
 13
 [F]irst, that the SSDs, as agents of the state, were guilty of operating a regional system of segregated schools that centered on and impacted Kansas City with blacks and made the suburbs whiter before 1954; second, that the SSDs failed in their affirmative duty to eliminate the vestiges of the dual school system; and third, that the SSDs are liable for the effects of actions by the KCMSD and other defendants and can therefore be included in an interdistrict remedy.
 
 
 14
 Order of June 5, 1984 at 5. The district court found, based on the Milliken holding, that there was lack of proof of discriminatory intent in the establishment or change of any school district boundary and thus distinguished the interdistrict cases upon which the plaintiffs relied. It rejected the arguments that the SSDs were not separate and autonomous but were instead agents of the State. It further rejected the argument that, as agents and subdivisions of the State, the SSDs must be included in an interdistrict remedy absent any finding that they had committed specific violations by their own initiative.
 
 
 15
 The court examined the plaintiffs' argument that the pre-1954 dual school systems had caused racial segregation in the Kansas City metropolitan area. The court acknowledged the substantial increase in the KCMSD black population from 1910 to 1960, but found that the increase resulted principally from the unusual economic and employment ramifications of the World Wars and intervening Depression. Order of June 5, 1984 at 17. The absence of black schools in the SSDs, it found, had not discouraged black families outside or within Missouri from moving to and living in those districts. The district court also rejected the argument that within the SSDs any vestiges or significant effects of the pre-1954 dual school system remained. The acts thirty years past, the court found, had negligible current effects. While some of the SSDs had dual school systems in the pre-1954 era and some did not,[7] after Brown I each had disestablished its pre-1954 school system with deliberate speed and all vestiges of those systems have long since disappeared. The district court entered separate findings with respect to each SSD. It found that all were unitary, most by 1955, in immediate compliance with the mandate of Brown I, two more by the 1957-58 school year, and the last, Park Hill, was fully integrated by the 1959-60 school year. Id. at 43-95.
 
 
 16
 The court then considered the plaintiffs' second theory, that the SSDs had failed in their duty, pursuant to the mandate of Brown II, to eliminate vestiges. The district court found that the establishment of an association of regional school districts did not negate the autonomy of the individual SSDs, and that the sharing of sales tax revenues by certain of the SSDs whose area may have been partly within the Kansas City, Missouri, city limits did not amount to a constitutional violation. Id. at 19-21. Further, a juvenile home, local special and vocational education programs, and particularly the creation of certain vocational education districts were examined and found not to have been constitutional violations on the part of the SSDs. Id. at 21-26. The district court also examined a statute enacted by the Missouri General Assembly in 1957 enlarging the size of a city that should constitute a single school district.[8] The court found that the enactment was not driven by an intent to concentrate black students within KCMSD, and therefore, was not an intentional interdistrict violation. Id. at 28-29. The court also examined the SSDs' response to recommendations of the Spainhower School District Commission of 1979, regarding realignment of boundaries so as to create some twenty school districts in the state, and with respect to financing and local control, and found no evidence that any of the SSDs rejected or declined to consider these proposals for reasons at all related to race. It further rejected arguments based upon employment practices in the SSDs.
 
 
 17
 The district court finally analyzed in detail plaintiffs' third theory, that the SSDs may be included in an interdistrict remedy because the effects of others' discriminatory acts were felt within the SSDs. It found no evidence that white families had been lured to or black families discouraged from living in the SSDs. Nor did any of the factual evidence concerning housing implicate any of the SSD defendants. Id. at 34-35. The steady increase in black enrollment in the SSDs since 1968, particularly in Raytown, Hickman Mills, Center, and Grandview districts,[9] and the fact that in 1980, 23,434 blacks resided outside the principal contiguous area was found to refute the testimony of plaintiffs' experts. The court rejected white-flight theory as a constitutional violation by the SSDs. Id. at 36-39.
 
 
 18
 The district court also addressed plaintiffs' claims regarding housing violations. While the court found that before 1948, in several areas within the SSDs restrictive covenants were enforced, the court further found that such enforcement did not have a current significant segregative effect.[10] With respect to public housing, it found that such housing is available in significant amounts within every SSD and that the HUD section 8 program is available in all parts of the metropolitan area. No testimony linked any SSD to the transition of neighborhoods within the KCMSD from white to black and the accompanying white flight which had taken place in Kansas City since 1940. Id. at 41.
 
 
 19
 The court therefore concluded that there was no interdistrict violation and interdistrict effect. Thus, as required by Milliken, interdistrict relief was denied. Id. at 95. The court stressed that awarding relief " 'would impose on the outlying districts, not shown to have committed any constitutional violation, a wholly impermissible remedy based on a standard not hinted at in Brown I and II or any holding of this Court.' " Id. at 96 (quoting Milliken, 418 U.S. at 746, 94 S.Ct. at 3128). It rejected a cumulative effect and found plaintiffs' evidence de minimis at most and legally insufficient to justify the relief sought against the SSDs. Id. at 97-98. The court thus dismissed the case against the SSDs.
 
 INTRADISTRICT LIABILITY FINDINGS
 
 20
 The district court then tried the intradistrict issues and found that the inferior education indigenous to the State-compelled dual school system has lingering effects in the KCMSD. Jenkins v. Missouri, 593 F.Supp. at 1492. The district court recognized the stipulation that before 1977 KCMSD was not unitary and did not comply with federal regulations. Id. at 1489. KCMSD was majority white in enrollment until 1970 and could have achieved mathematical racial balance in its schools. Id. at 1492. Instead, it chose to operate some completely segregated schools and other integrated ones. In 1974, twenty years after Brown I, 39 schools were more than 90% black; another 38 had 10% to 90% black enrollment. Eighty percent of all blacks in the district attended schools that were 90% black. Only 19% of the blacks attended a school that was 10% to 90% black. Id. at 1492-93. As of 1977, 25 one-race schools under the pre-1954 system remained 90% or more of the same race. Id. In addition, four schools that were black under the dual system were predominantly black when closed in 1968. Id. at 1492. In the 1983-84 school year no KCMSD school had less than 30% black enrollment, but 24 schools were racially isolated at more than 90% black. Id. at 1493.
 
 
 21
 The court found that the KCMSD still has not entirely dismantled the dual school system. The court then made particular findings on the liberal transfer policy, the neighborhood school policy, and attendance zones, and found that these, rather than facilitating integration, fostered the maintenance of segregated attendance patterns. Intact busing was found to have been segregative in intent and effect, but, as it was stopped in the 1960's, no continuing violation existed. The court found that plans had not been adopted for district-wide desegregation until 1977-78. Id. at 1493-94.
 
 
 22
 Similarly, the court imposed liability on the State based on its intentional creation of the dual school system and the obligation that existed to disestablish such a system.[11] As vestiges of the State's dual school system lingered in KCMSD, the obligations of KCMSD and the State had not been met. The court rejected the State's argument that constraints imposed by the state constitution or statutes prevented its affirmative disestablishment of the dual school system. It held the issues in favor of the Jenkins class and against KCMSD and the State and held the issues in favor of KCMSD and against the State on the cross-claim. Id. at 1505.
 
 LIABILITY OF HUD
 
 23
 With respect to the claim against HUD, the court examined Federal Housing Administration appraisal practices before 1949, cooperative agreements with the City of Kansas City under the auspices of the Housing Authority of Kansas City (HAKC) and the Land Clearance for Redevelopment Authority (LCRA), and section 8 certificates. It found that HUD followed a balanced housing policy and attempted to insure that assisted housing was located in both innercity and suburban areas. There was no evidence that HUD's site selection and approval practices for federally subsidized multi-family housing substantially affected the racial composition of schools within KCMSD. Id. at 1499. The court pointed to HUD's affirmative marketing efforts to apprise participating section 8 certificate-holders that affordable housing was available throughout the entire community. Id. at 1500. There was no evidence that HUD routinely denied blacks FHA mortgages, that it discriminatorily foreclosed on mortgages held by blacks, or that it avoided selling the homes on which its insured mortgages had been foreclosed to blacks. Further, there was no evidence that neglect of HUD-held homes was racially discriminatory in intent or purpose. The issues were held in favor of HUD.
 
 I.
 
 24
 We have had earlier occasion to deal with the legal standards governing interdistrict school desegregation cases. See, e.g., Little Rock School District v. Pulaski County Special School District No. 1, 778 F.2d 404 (8th Cir.1985); Liddell v. Missouri, 731 F.2d 1294 (8th Cir.), cert. denied, 469 U.S. 816, 105 S.Ct. 82, 83 L.Ed.2d 30 (1984).[12] We draw our basic guidance from the Supreme Court's decision in Milliken v. Bradley, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974):
 
 
 25
 Before the boundaries of separate and autonomous school districts may be set aside by consolidating the separate units for remedial purposes or by imposing a cross-district remedy, it must first be shown that there has been a constitutional violation within one district that produces a significant segregative effect in another district. Specifically, it must be shown that racially discriminatory acts of the state or local school districts, or of a single school district have been a substantial cause of interdistrict segregation. Thus an interdistrict remedy might be in order where the racially discriminatory acts of one or more school districts caused racial segregation in an adjacent district, or where district lines have been deliberately drawn on the basis of race. In such circumstances an interdistrict remedy would be appropriate to eliminate the interdistrict segregation directly caused by the constitutional violation. Conversely, without an interdistrict violation and interdistrict effect, there is no constitutional wrong calling for an interdistrict remedy.
 
 
 26
 418 U.S. 744-75, 94 S.Ct. at 3127 (citations omitted).
 
 
 27
 Two courts of appeals have read this language to require clear proof of cause and effect of a constitutional violation, and a careful delineation of the extent of the effect, before an interdistrict remedy may be invoked. Goldsboro City Board of Education v. Wayne County Board of Education, 745 F.2d 324, 332 (4th Cir.1984); Lee v. Lee County Board of Education, 639 F.2d 1243, 1256 (5th Cir.1981). As the Fifth Circuit stated in Lee:
 
 
 28
 We believe the Court's deliberate choice of phrases such as "substantial" or "direct cause" and "significant segregative effect" also expresses an insistence that in cases where an interdistrict remedy is requested, there must be clear proof of cause and effect and a careful delineation of the extent of the effect. In the absence of such a showing, school district lines are to be carefully observed and desegregation remedies confined to orders affecting the school district in which the condition of segregation is manifest.
 
 
 29
 Id. at 1256.
 
 
 30
 In addition to "clear proof" of the interdistrict violation and its interdistrict effect and "a careful delineation" of the extent of the interdistrict effects, it must be shown that the interdistrict segregative effects are current. Lee, 639 F.2d at 1260. Federal courts may not invoke their equitable power to fashion a remedy to correct a condition unless it currently offends the Constitution. As the Court stated in Milliken: "A federal remedial power may be exercised 'only on the basis of a constitutional violation' and, '[a]s with any equity case, the nature of the violation determines the scope of the remedy.' " Id. at 738, 94 S.Ct. at 3124 (quoting Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971)); see also General Building Contractors v. Pennsylvania, 458 U.S. 375, 399, 102 S.Ct. 3141, 3154-55, 73 L.Ed.2d 835 (1982) (a remedial decree should "extend no farther than required by the nature and the extent of that violation").
 
 II.
 
 31
 We must also recognize at the outset the importance of the district court's factual findings in school desegregation cases. As we stated in Little Rock:
 
 
 32
 We will not reverse the district court's factual findings with respect to liability unless we conclude that they are clearly erroneous. Fed.R.Civ.P. 52(a); Anderson v. City of Bessemer City [470 U.S. 564], 105 S.Ct. 1504 [84 L.Ed.2d 518] (1985); Pullman-Standard v. Swint, 456 U.S. 273, 287-90 [102 S.Ct. 1781, 1789-91, 72 L.Ed.2d 66] (1982); Dayton II [v. Brinkman ], 443 U.S. at 534 n. 8 [99 S.Ct. 2971 at 2977 n. 8, 61 L.Ed.2d 720 (1979) ]; Columbus Board of Education v. Penick, 443 U.S. at 468-71 [99 S.Ct. 2941 at 2952, 2983, 61 L.Ed.2d 666 (1979) ] (concurring opinions of Burger, C.J., and Stewart, J.); United States v. United States Gypsum Co., 333 U.S. 364, 395 [68 S.Ct. 525, 542, 92 L.Ed. 746] (1978). Nor will we reverse such findings when they are based on inferences from other facts unless the rigorous standards of the same rule are met. Anderson, 105 S.Ct. at 1511. The Supreme Court has emphasized the importance of the clearly erroneous rule in civil rights cases, see, e.g., Pullman-Standard v. Swint, 456 U.S. at 287-90 [102 S.Ct. at 1789-91], and, more particularly, in school desegregation cases:
 
 
 33
 The elimination of the more conspicuous forms of governmentally ordained racial segregation * * * counsels undiminished deference to the factual adjudications of the federal trial judges in cases such as these, uniquely situated as those judges are to appraise the societal forces at work in the communities where they sit.
 
 
 34
 Columbus Board of Education v. Penick, 443 U.S. at 449, 470 [99 S.Ct. at 2941, 2983] (1979) (Stewart, J., concurring, with whom Burger, C.J., joins, concurring).
 
 
 35
 Little Rock, 778 F.2d at 410-11. See Morrilton School District No. 32 v. United States, 606 F.2d 222, 230 (8th Cir.1979), cert. denied, 444 U.S. 1071, 100 S.Ct. 1015, 62 L.Ed.2d 753 (1980); see also Riddick v. School Board of the City of Norfolk, 784 F.2d 521, 533 (4th Cir.1986) (factual findings by a district court in school desegregation cases are entitled to great deference on review "especially where the presiding judicial officer has lived with a case for many years").
 
 
 36
 The Supreme Court in Anderson v. City of Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985), has explained that the trial judge's role is to determine fact, and duplication of these efforts in the courts of appeals "would very likely contribute only negligibly to the accuracy of fact determination." Id., 105 S.Ct. at 1512. The Court stated:
 
 
 37
 The reviewing court oversteps the bounds of its duty under Rule 52 if it undertakes to duplicate the role of the lower court. "In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues de novo." Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123 [89 S.Ct. 1562, 1576, 23 L.Ed.2d 129] (1969). If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.
 
 
 38
 Id. at 1511-12.
 
 
 39
 Chief Judge Lay's dissent,[13] in violation of the teachings of Anderson, duplicates the role of the district court and is an exercise in appellate factfinding. A reading of the dissent is sufficient to demonstrate the rejection of the district court's carefully weighed findings of fact and substitution of those more desirable, frequently based on evidence considered and rejected by the district court.[14] While on some occasions placing the mantle of the clearly erroneous rule about the discussion, it is evident that Chief Judge Lay was engaging in an original evaluation of the voluminous and ofttimes contradictory record seeking an ultimate conclusion more satisfactory than that reached by the district court. This is directly contrary to the mandate of Anderson.
 
 III.
 
 40
 The Jenkins class does not challenge the findings of the district court. Rather, it argues that the findings establish continuing interlocking, interdistrict violations whose cross-district nature and metropolitan-wide scope require relief encompassing the SSDs. It argues particularly that there is an interdistrict violation or effect under Milliken and Hills v. Gautreaux, 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976), and points to several independent bases for interdistrict relief. These are: the pre-1954 interdistrict system of locating dual schools; the State's and the SSDs continuing interdistrict violations; KCMSD's officially sanctioned suburban flight violation; the State's market-wide dual housing systems; and LCRA and HAKC's racial steering and siting violations.
 
 
 41
 The Jenkins class further argues that the district court denied interdistrict relief based on a "concatenation of legal error" as to interdistrict liability. It argues that in six respects the district court abandoned controlling legal principles in concluding that: the existence of dual schools before 1954 does not now amount to a constitutional violation; the SSDs were autonomous and independent; the SSDs were absolved of liability for their pre-1954 violations and erroneously ignoring the post-1954 segregative acts and omissions; without a finding of fault, the SSDs may not be required to take part in eliminating the effects on children in their districts of the State's metropolitan-wide dual school and housing violations; the SSDs did not invidiously entice white families to move into their district, and that unconstitutional actions within one district making it blacker which reciprocally affects adjacent districts by making them whiter may not provide an independent basis for interdistrict relief; and absent intentional segregative acts by each school board sought to be included, a finding of liability against actors in the housing market is irrelevant to the SSDs. The housing argument will be discussed separately in IV and V.
 
 
 42
 Finally, the Jenkins class argues that the district court applied an improper burden and standard of proof of significant effects in an improperly piecemeal fashion. It further argues that the district court improperly fragmented the evidence of unconstitutional acts rather than evaluating the evidence as a whole. It argues that the district court's finding of six distinct metropolitan-wide constitutional violations satisfies Milliken's significant segregative effect standard. It urges under Swann that proof of a system with a history of segregation warrants a presumption against schools that remain disproportionate in their racial composition. It argues that the proof acknowledged by the court, of prior de jure segregation on an area-wide basis, coupled with a patently continuing racial imbalance among the SSDs' student and faculty compositions, established the liability of the SSDs. It further argues that the district court improperly rejected much of the evidence, and improperly barred the presentation of quantitative evidence, as irrelevant.
 
 
 43
 The broad scope of these arguments is considerably narrowed when viewed in light of significant factual findings of the district court. These findings are not challenged as clearly erroneous. The district court found that the SSDs were autonomous and locally controlled,[15] and that the State was powerless to require a merger or consolidation.
 
 
 44
 The district court recognized the stipulation that before 1954 the State mandated dual school systems and mandated SSDs' compliance in maintaining dual systems. It found that all SSDs met their constitutional obligation to operate a unitary school system within a maximum of four years after Brown I, most of them doing so within one year. The dismantling of the dual system was accomplished with all deliberate speed. Order of June 5, 1984 at 99. It specifically found that the evidence established that there was no barrier to movement of blacks into the SSDs. Id. at 39. It found the pre-Brown acts thirty years past to have negligible present effects. It further found that the faculty and staff composition of the SSDs do not affect the racial composition of the student bodies. The court found the faculty were hired and promoted on a racially neutral basis. The court could not conclude that there was an interdistrict violation from any possible intradistrict factors.
 
 
 45
 The factual argument based on the pre-Brown interdistrict system of locating dual schools flies in the face of the district court's finding that the pre-Brown acts have negligible present effects. Chief Judge Lay's dissent suffers from a similar infirmity as the district court made numerous findings interspersed through its order concerning the negligible and de minimis nature of any such effects. These findings are not clearly erroneous.[16] These findings make unnecessary a detailed recitation of the pre-1954 evidence.
 
 
 46
 The argument that the State and SSDs participated in continuing interdistrict violations is contrary to the district court's finding that the SSDs had met their constitutional obligation to operate unitary school systems within four years after Brown I, most of them doing so within a year. Similarly, the argument that KCMSD officially sanctioned suburban flight looks first to KCMSD's violation which the district court clearly found to be only intradistrict in nature. The argument based on flight into neighboring SSDs making the southeast area schools blacker and recipient SSD schools whiter, thereby causing racial segregation in adjacent districts, is contrary to the district court's finding that there was no barrier of movement to blacks to the SSDs. The district court specifically found that there was considerable increase in the black enrollment of the SSDs, particularly Center, Grandview, Hickman Mills, and Raytown.
 
 
 47
 Similarly, in the enumeration of six legal errors, three are based upon pre-1954 actions of the SSDs. The district court's findings that these acts have negligible present effect fundamentally undermines the validity of these arguments. As we have seen, the argument based on the actions of KCMSD and white flight run contrary to the factual findings mentioned above.
 
 
 48
 So also, the argument that the SSDs, though not at fault, would still be liable to take part in eliminating the effects on children in their districts of the State's metropolitan-wide dual school violations, suffers from two fatal deficiencies. It ignores the lack of finding of any such effects, and is contrary to the district court's findings that within at most four years after Brown I, any vestiges of the dual school systems that may have existed in the SSDs had been eliminated.
 
 
 49
 The Jenkins class further argues that Swann raises a presumption against schools that are disproportionate in their racial composition. The district court did not err in rejecting the Swann presumption. Milliken was careful to point out that disparity in the racial composition of pupils within a single district merely signals an inquiry into the causes for pronounced racial identifiability of schools within one school system. The Milliken limitation of this presumption is the subject of comment by the Fifth Circuit in Lee v. Lee County Board of Education, where the court stated:
 
 
 50
 It seems important to note also that Milliken, unlike Swann and Keyes v. School Dist. No. 1, 413 U.S. 189 [93 S.Ct. 2686, 37 L.Ed.2d 548] (1973), did not sanction the use of any presumptions on the question of the cause of interdistrict segregation. Thus, while Swann, as noted above, permits an inference that the continued existence of one-race schools in a system that formerly practiced de jure segregation is a vestige of such segregation, and Keyes permits one to infer the existence of systemwide de jure segregation from proof that school authorities have pursued an intentional policy of segregation in a substantial portion of a school district, Milliken refused to sanction a presumption that significant disparities in the racial composition of autonomous school districts resulted from impermissible action by those districts and thus justified imposing upon them the burden of remedying conditions of segregation existing in other districts. The Milliken Court noted that both Keyes and Swann merely involved "the use of a significant racial imbalance in schools within an autonomous school district as a signal which operates to shift the burden of proof [which] is a very different matter from equating racial imbalance with a constitutional violation calling for a remedy." 418 U.S. at 741 n. 19 [94 S.Ct. at 3125 n. 19] * * *.
 
 
 51
 639 F.2d at 1254.
 
 
 52
 Contrary to the argument of the Jenkins class, cases of this court do not adopt the Swann presumption in interdistrict cases. See Morrilton School District No. 32 v. United States, 606 F.2d at 230; see also United States v. Missouri, 515 F.2d 1365 (8th Cir.), cert. denied, 423 U.S. 951, 96 S.Ct. 374, 46 L.Ed.2d 288 (1975); Haney v. County Board of Education, 410 F.2d 920 (8th Cir.1969). They simply recognize that racial gerrymandering, which the district court specifically found is absent here, will make school authorities responsible for the foreseeable effects. So also, the argument concerning the presumption runs directly contrary to the teachings of Washington v. Davis, 426 U.S. 229, 240, 96 S.Ct. 2040, 2047-48, 48 L.Ed.2d 597 (1976), that there must be a showing in a school desegregation case of "a current condition of segregation" resulting from intentional state action. The district court's finding that the SSDs were autonomous prevents a conclusion that there is a single system to which such a presumption applies.
 
 
 53
 The arguments of the Jenkins class run contrary to the facts found by the district court.[17] In essence, in the detailed recitation of evidence, it seeks to have this court substitute its judgment for that of the district court. This is contrary to the general rule of Anderson v. City of Bessemer City, supra, and to the specific dictate of this court that we give "undiminished deference to the factual adjudications of federal trial judges in cases such as these, uniquely situated as those judges are to appraise the societal forces at work in the communities where they sit." Little Rock, 778 F.2d at 410-11.
 
 IV.
 
 54
 We next consider arguments advanced by the Jenkins class that racially discriminatory acts by the State in housing-related areas justified interdistrict relief involving the SSDs. Before considering the district court's findings on this matter, we must address the class' argument that the district court misread Milliken in deciding whether the SSDs could be required to participate in an interdistrict remedy. In doing so, we must read all of Milliken and all of the district court's order. According to the class, the district court read Milliken as holding that each SSD could not be required to participate in an interdistrict remedy absent a finding that that SSD had engaged in racially discriminatory conduct.
 
 
 55
 The passage from Milliken set forth above in Part I, supra, made plain that, before a federal court may impose an interdistrict remedy, "it must first be shown that there has been a constitutional violation within one district that produces a significant segregative effect in another district." 418 U.S. at 744-45, 94 S.Ct. at 3127. Specifically, the court must find that racially discriminatory acts "have been a substantial cause of interdistrict segregation." Id. at 745, 94 S.Ct. at 3127. Absent this showing, "there is no constitutional wrong calling for an interdistrict remedy." Id. On the facts before it, the Court was forced to conclude in Milliken that:
 
 
 56
 With no showing of significant violation by the 53 outlying school districts and no evidence of any interdistrict violation or effect, the court went beyond the original theory of the case as framed by the pleadings and mandated a metropolitan area remedy. To approve the remedy ordered by the court would impose on the outlying districts, not shown to have committed any constitutional violation, a wholly impermissible remedy based on a standard not hinted at in Brown I and II or any holding of this Court.
 
 
 57
 Id.
 
 
 58
 The Court's decision in Hills v. Gautreaux, 425 U.S. 284, 96 S.Ct. 1538, two years later, forcefully emphasized this central holding of Milliken. Justice Stewart wrote for the Court:
 
 
 59
 Once a constitutional violation is found, a federal court is required to tailor "the scope of the remedy" to fit "the nature and extent of the constitutional violation." * * * In Milliken, there was no finding of unconstitutional action on the part of the suburban school officials and no demonstration that the violations committed in the operation of the Detroit school system had had any significant segregative effects in the suburbs. * * * The desegregation order in Milliken requiring the consolidation of local school districts in the Detroit metropolitan area thus constituted direct federal judicial interference with local governmental entities without the necessary predicate of a constitutional violation by those entities or of the identification within them of any significant segregative effects resulting from the Detroit school officials' unconstitutional conduct. Under these circumstances, the Court held that the interdistrict decree was impermissible because it was not commensurate with the constitutional violation to be repaired.
 
 
 60
 Id. at 293-94, 96 S.Ct. at 1544-45 (emphasis added) (citations omitted); see also Goldsboro City Board of Education v. Wayne County Board of Education, 745 F.2d at 328 ("An independent school district which has not caused segregation in a neighboring independent district has no duty to rectify a racial imbalance in the other districts.").
 
 
 61
 Milliken and Hills make clear that we may grant interdistrict relief only to remedy a constitutional violation committed by the SSD, or to remedy an interdistrict effect in the SSD caused by a constitutional violation in KCMSD. The district court first carefully considered whether the SSDs had violated the Constitution. It found they had not. Indeed, the district court concluded that to award relief in this case would, as the Court concluded in Milliken, "impose on the outlying districts, not shown to have committed any constitutional violation, a wholly impermissible remedy." 418 U.S. at 745, 94 S.Ct. at 3127. Order of June 5, 1984 at 96. It further found that the Jenkins class had not established any acts or omissions by the SSDs "which have had a substantial segregative impact in any other district."[18] The district court was compelled to make this inquiry by Milliken and Hills, stressing as they do the significance of the commission of a constitutional violation. The court's consideration of the appropriateness of interdistrict relief would have been incomplete without this inquiry. Milliken makes plain that the issue of whether the parties are constitutional violators must be considered as well as the issue of whether there is a constitutional violation in one district causing a significant segregative effect in a neighboring district.
 
 
 62
 Moreover, contrary to the argument of the class that the court looked only to the culpability of the SSDs, the scope of the order is far broader. The court's order admittedly emphasizes the absence of culpability of the suburban districts. However, the court explicitly recognized that under Milliken "there must be evidence of a constitutional violation in one district that produces a significant segregative effect in another district." Order of June 5, 1984 at 14, 95. The district court compared the theories before it with those in Milliken. It noted that only the schools in one district were affected and that the remedy must be limited to that system. In examining the cause and effect issue, the court noted that "not only is plaintiff's evidence here blurred as to cause and effect, there is no 'careful delineation of the extent of the effect.' " Id. at 96 (quoting Lee, 639 F.2d at 1256). The district court thus dealt not only with the issue of whether the SSDs were constitutional violators but also whether there were significant interdistrict segregative effects. See V, infra. When it did so, it made specific findings that negate current significant interdistrict effects, and concluded that the requirements of Milliken had not been met.
 
 
 63
 In Bell v. Board of Education, 683 F.2d 963 (6th Cir.1982), the Sixth Circuit suggested a number of practical problems in attempting to order school districts to remedy housing violations:
 
 
 64
 We do not find any case addressing the argument that a school board otherwise innocent of segregative intent is liable for the discriminatory housing practices of other governmental agencies. We decline to accept this argument. Under this argument the discriminatory conduct of the FHA in making housing loans and local housing authorities in the construction and rental of public housing is attributable to school boards. Such a proposal places too heavy a burden on the schools to remedy wrongs for which they are no more or less responsible than the plaintiffs, the courts, the churches, the Congress or other institutions. Plaintiffs do not suggest how the schools, after a finding of liability, would go about remedying this problem or what kind of order a federal court could enter that might as a practical matter have a chance of changing the fact that black and white families live in separate neighborhoods in most towns and cities.
 
 
 65
 Id. at 968 (footnote omitted).
 
 
 66
 The Supreme Court has given consistent admonition in Hills and Milliken that federal courts may not "restructur[e] the operation of local governmental entities that were not implicated in any constitutional violation." 425 U.S. at 296, 96 S.Ct. at 1546. The district court's findings amply establish that the SSDs were not "implicated" in the State's housing violations. See Part V.
 
 
 67
 We have considered that culpability is an important factor in interdistrict analysis. In Little Rock, 778 F.2d 404, we ordered that the boundaries of the North Little Rock School District remain intact "in partial recognition of the fact that the nature and extent of its interdistrict violations are less severe than those of the other defendants." Id. at 435. Judge Arnold's separate concurring and dissenting opinion recognizes that the remedy to be imposed against the SSDs must be "limited by the fact that the SSD is not itself a constitutional violator." Post at 694.
 
 
 68
 We recognize that Morrilton School District No. 32 v. United States, 606 F.2d 222, states that school districts may be required to participate in a remedy when "there was no evidence implicating them in a direct way with the establishment" of the segregated district. Id. at 228. Morrilton is a gerrymandering case. Its broad language must be limited to its facts, an interdistrict violation in the consolidation of school districts, with the effects felt in each.[19] An attempt to imbue Morrilton with broader force disregards not only its salient facts, but also the Seventh Circuit precedent it quotes: "If the state has contributed to the separation of the races, it has the obligation to remedy the constitutional violations. That remedy may include school districts which are its instrumentalities and which were the product of the violation." Morrilton, 606 F.2d at 229 (quoting United States v. Board of School Commissioners, 573 F.2d 400, 410 (7th Cir.), cert. denied sub nom. Bowen v. United States, 439 U.S. 824, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978)). Here the district court clearly found that the SSDs were autonomous, not mere instrumentalities of the State, and their boundaries not the product of any constitutional violation by the State. Despite plaintiffs' urging, the language of Morrilton is limited to its facts, and does not reach the issues we face today.
 
 V.
 
 69
 The Jenkins class argues that a dual housing violation, fueled by State enforcement of racially restricted covenants and felt in virtually every other housing program in the three-county area touching lending, appraisal, and sales practices, effectively channelled black and white low-income families to separate communities. Such violation and effects, it argues, were interdistrict, and therefore require the interdistrict remedy of consolidation. The Jenkins class further argues that as part and parcel of the State's dual housing market violations, there were constitutional violations by the LCRA and HAKC, which diverted blacks exclusively to the black areas within the KCMSD.
 
 
 70
 The district court made a general finding that not only is the evidence "blurred as to the cause and effect, there was no 'careful delineation of the extent of the effect.' " Order of June 5, 1984 at 96. It made specific findings that negate the existence of significant interdistrict current effects in the SSDs.[20] As Milliken requires an interdistrict violation causing a significant segregative effect in another district, these findings pose an insuperable barrier to granting interdistrict relief.
 
 
 71
 The district court found that school district boundaries had not constrained black movement in any way, id. at 39, and no acts of the SSDs contained blacks in KCMSD or kept them out of the SSDs. Id. at 3. The absence of black schools in the defendant districts before Brown did not discourage black families from outside or within Missouri from moving to and living in those districts. Id. at 18. The district court found that there was steady increase in black enrollments in the SSDs since 1968, and in 1980, 23,434 blacks resided outside the principal contiguous area. Id. at 36-37. We have observed the increase in black enrollment in Hickman Mills, Center, Grandview, and Raytown. See note 9, supra.
 
 
 72
 The court found that the substantial increases in the KCMSD black population were in large part due to the unusual economic and employment ramifications of the World Wars and intervening Depression. Id. at 17. None of the SSDs were shown by the expert Dr. Tobin to have played any significant role in housing matters or to have exerted any control whatsoever over the private decisions people made about where to live. Id. at 37-38. The district court made numerous findings concerning housing choices, economics, and job opportunities. Jenkins v. Missouri, 593 F.Supp. at 1490. In rejecting the expert testimony of Dr. Kane, the court pointed to the importance of job location, ethnic clustering, and personal preference. Id. at 1491. These findings demonstrate the importance of personal choice,[21] referred to by at least two courts as "voting with feet." See Riddick, 784 F.2d at 537; Davis v. East Baton Rouge Parish School Board, 721 F.2d 1425, 1435 (5th Cir.1983).
 
 
 73
 Regarding the existence of racially restrictive covenants, stressed by the Jenkins class and by Judge Arnold in his concurring and dissenting opinion, the district court made it plain that the restrictive covenants have no current effect in the SSDs. The district court found no evidence that the covenants were enforced by state courts following Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). It recognized the tremendous housing growth in many suburban areas after 1948, when the covenants were a nullity. That blacks presently live in locations previously covered by restrictive covenants further undermines their significance. Order of June 5, 1984 at 39.[22]
 
 
 74
 These findings of the district court that we have outlined above deal with conditions or effects that would have been expected had there been an interdistrict effect in the SSDs flowing from housing violations committed by the State or other actors in KCMSD.
 
 
 75
 Judge Arnold's concurring and dissenting opinion argues, as does the Jenkins class, that Evans v. Buchanan, 393 F.Supp. 428 (D.C.Del.), aff'd 423 U.S. 963, 96 S.Ct. 381, 46 L.Ed.2d 293 (1975), and United States v. Board of School Commissioners, 637 F.2d 1101 (7th Cir.), cert. denied, 449 U.S. 838, 101 S.Ct. 114, 66 L.Ed.2d 45 (1980), both approved interdistrict remedies based in part upon housing discrimination practiced by state actors. Post at 689.[23] In Evans, the district court found that governmental authorities had provided public housing almost exclusively within the confines of Wilmington and restricted the availability of private and public housing to blacks in suburban New Castle County. 393 F.Supp. at 435. In Board of School Commissioners, the Seventh Circuit affirmed a finding that all public housing in the county had been located within the boundaries of the Indianapolis public school district and this was the segregative intent of state agencies.[24] 637 F.2d at 1110-11.
 
 
 76
 In this case the district court findings are far different. There was no lack of balance between federally assisted housing within the KCMSD and the suburban areas, as demonstrated by the 6,832 HUD-insured or subsidized multi-family units within KCMSD and 9,872 such units in the eleven SSDs. Jenkins v. Missouri, 593 F.Supp. at 1499. HUD efforts were designed to insure that participating section 8 certificate-holders were aware that affordable housing was available throughout the entire community and that they were informed of their rights under the fair housing laws. Id. at 1500. The court pointed to the affirmative marketing efforts in the Parvin Estates area, located in predominantly white North Kansas City, which were never able to attract more than 12% minority residents. Id. The district court further found no evidence that the practices of HUD in site selection and approval for federally subsidized multi-family housing had a substantial effect upon the racial make-up of schools in KCMSD. Id. at 1499. The findings contained in the analysis of HUD's liability also relate to LCRA and HAKC.
 
 
 77
 The facts relied on to support the housing violations in Evans and Board of School Commissioners are directly contrary to those found in this case. These cases simply give no assistance to the argument that there have been constitutional violations by housing actors having a significant segregative effect in the SSDs.
 
 
 78
 Other findings on housing practices are significant. The district court specifically found that FHA appraisal practices before 1950 had at most a de minimis effect on present racial housing patterns. It examined LCRA practices and its role in administering urban renewal programs under the Housing Act of 1949. It found that HUD had investigated LCRA and issued a report in April 1972 finding discrimination in LCRA's referral practices and in requiring that such practices be ceased and reports filed. Failure to correct this led in June 1973 to refusal to fund the program and a cooperative agreement between HUD, LCRA, and the City of Kansas City by which the city assumed responsibility for relocation under the Act. The relocation report showed that during the period from 1971 to 1976, only 174 black families were relocated. Jenkins v. Missouri, 593 F.Supp. at 1497-98. Again, the finding of the district court concerns and is limited to intradistrict claims. This finding is not sufficient to justify remand to the district court for consideration, as Judge Arnold suggests, of what interdistrict effect may have resulted from such actions.
 
 
 79
 The district court found that while the HAKC constructed seven family projects between 1952 and 1963 within the model cities or urban renewal areas, the location was in accordance with congressional acts and the assignment practices were approved by HUD. Id. at 1498-99. The court reviewed HUD policies and found expenditures to be balanced between KCMSD and the suburban areas. Id. at 1499. It further found no evidence that the practices of HUD in site selection and approval for federally subsidized multi-family housing substantially affected the racial make-up of schools within the KCMSD. Id.
 
 
 80
 These findings clearly were made with reference to the claims against HUD. They do not apply to the housing practices in KCMSD. They belie the possibility of interdistrict effect occurring in the SSDs.
 
 
 81
 Another weakness immediately is apparent in analyzing the Jenkins class' arguments in the context of the district court's findings. The activities of LCRA and HAKC to which attention is primarily pointed, the investigation and the change in practices, both occurred in the 1970's after KCMSD had experienced the substantial increase in black school population. The exhibit relied upon by the district court in its findings demonstrates that the KCMSD black population was 18.9% in 1955-56, that it had grown to 30.7% in 1961-62, and had reached 50.2% in the 1970-71 school year. The substantial increase which resulted in the district becoming majority black thus had occurred before the particular events to which the Jenkins class points. To argue that alleged LCRA and HAKC violations created these interdistrict effects simply ignores logic.
 
 
 82
 The court specifically found that KCMSD assignments of children to particular schools had an intradistrict effect and were not influenced by any SSD. Further, these actions did not have a significant effect on the enrollment in any SSD. Order of June 5, 1984 at 38.[25]
 
 
 83
 The court considered many non-governmental housing factors and rejected the theory that liability may be imposed upon the SSDs for being the recipients of people moving for whatever reason. The court found that red-lining, steering, and block-busting practices by private real estate agents, which may have affected the racial composition of KCMSD, were not the actions of KCMSD or of any SSD and are beyond the control of any school district. The transition of neighborhoods from white to black and accompanying white flight existed in Kansas City since the 1940's, but no testimony linked the SSDs to the process. Id. at 41. Absent a nexus between the conduct of the SSDs and the policies or practices of independent housing actors, the court would not hold the SSDs liable for racial imbalance. Id. at 42.
 
 
 84
 Judge Arnold stresses the district court's findings that there is a dual housing market impacting blacks in the KCMSD and causing the public schools to swell in black enrollment, 593 F.Supp. at 1491, and that the State had encouraged racial discrimination by private individuals. Id. at 1503. The court went no further but commented that the question of State liability would be close if it hinged solely on this encouragement of private discrimination. It then proceeded to base its finding against the State on the intentional creation of the dual school system in KCMSD and the failure to eradicate its vestiges. The Jenkins class makes much of these statements by the district court. Nevertheless, they fall short of making a specific finding of a constitutional violation, and certainly make no finding of any interdistrict effect. That the findings are in the district court's separate opinion concerning intradistrict liability prevents extension of such findings to arguments regarding interdistrict effect in the SSDs.
 
 
 85
 Thus, even accepting the Jenkins class' arguments that the district court misread Milliken by improperly limiting its inquiry solely to whether the SSDs were guilty of committing constitutional violations, we conclude that the factual findings of the district court effectively foreclose findings of interdistrict effect in the SSDs flowing from constitutional violations with respect to housing that may have occurred in KCMSD.[26] It is, of course, evident from the findings that there were no constitutional violations in the SSDs. Under Milliken this answers the arguments made by the Jenkins class, as well as the further articulation in the arguments of KCMSD, and forecloses efforts to require the SSDs to be subject to the claim for interdistrict relief, be it consolidation or some step less drastic.
 
 
 86
 To consider isolated bits of evidence, de minimis in nature, and to mix this with speculation is insufficient to support the conclusion that there are additional factual issues not passed upon by the district court. The findings made were adequate to dispel the conclusion required by Milliken that there be significant segregative effects in the SSDs caused by actions of a constitutional violator in KCMSD.
 
 
 87
 The housing discussion is not complete without another word of caution. Plaintiff's expert, Dr. Gary Orfield, testified that the Kansas City metropolitan area, located in both Missouri and Kansas, comprised a single housing market. Dr. Kane testified that 7,239 black students now in Missouri schools would be in Kansas schools had there not been housing discrimination. Record at 7669-70, Pl's Exhibit 1265-R. A number of witnesses called by plaintiff testified their children were moved from the KCMSD to Johnson County, Kansas. Record at 6722-23, 6809, 6863-64, 6953. The district court dismissed the Kansas districts from this action in its order of October 6, 1978. School District of Kansas City v. Missouri, 460 F.Supp. at 431. Accordingly, it made no findings on these issues. This evidence, however, points to the serious complications present in a claim based on housing violations where the housing market extends into another state and there is movement from an impacted district into the other state.
 
 VI.
 
 88
 The Jenkins class relies particularly on decisions from Wilmington, Louisville, Indianapolis, and Allegheny County, in which interdistrict remedies had been ordered. These cases involved gerrymandering; the present case does not. The district court specifically found that the establishment and maintenance of school district boundaries was a local matter in Missouri, determined through local initiative, and uninfluenced by racial animus. The district court thus held the gerrymandering cases inapposite. We agree.
 
 
 89
 Evans v. Buchanan, 393 F.Supp. 428, considered the effect of Delaware legislation explicitly prohibiting the state board from altering the boundaries of the Wilmington school district, fixed as coterminous with the Wilmington city limits. The district court found no racially discriminatory purpose in the Act's freezing of the Wilmington district's boundaries. Id. at 439. It held, however, that the Act helped to maintain the racial identifiability of the Wilmington and the suburban New Castle County school districts and thus contributed to the segregation of the races. Id. at 445-46. The district court also found that the Wilmington district and the suburban districts were not meaningfully separate and autonomous. Id. at 428.
 
 
 90
 Similarly, in Newburg Area Council, Inc. v. Board of Education, 510 F.2d 1358 (6th Cir.1974), cert. denied, 421 U.S. 931, 95 S.Ct. 1658, 44 L.Ed.2d 88 (1975), the court observed that while the county was established by statute as the basic educational unit, "school district lines in Kentucky ha[d] been ignored in the past for the purpose of aiding and implementing continued segregation," and that "[s]uch disregard continue[d] to have an effect on the racial imbalance in the county's schools * * *." Id. at 1360. In addition, the court specifically recognized that both the Louisville and Jefferson County school districts had failed to eliminate all vestiges of state-imposed segregation. Id. at 1359. Accordingly, it is clear that unlike the present case, the Louisville boundary lines were purposefully manipulated to maintain segregated school districts.
 
 
 91
 United States v. Board of School Commissioners, 637 F.2d 1101, involved the exclusion of certain school districts from the Uni-Gov legislation which perpetuated the segregated white schools in suburban Marion County. Id. at 1105. The issue involved was whether the school boundaries should coincide with the expansion of the boundaries of the City of Indianapolis. The Fourth Circuit affirmed the findings that the decisions were made with discriminatory purpose. Id. at 1108.
 
 
 92
 In Hoots v. Pennsylvania, 672 F.2d 1107 (3d Cir.), cert. denied, 459 U.S. 824, 103 S.Ct. 55, 74 L.Ed.2d 60 (1982), the court pointed to findings that in 1971 the state and county boards intentionally created a district which was 63% black, and four nearby districts that were from 87% to over 99% white. Id. at 1111. This process involved the redrawing of school boundaries, and as such was a constitutional violation. Id. at 1120. The violation was interdistrict in nature and required interdistrict relief.
 
 
 93
 These cases all involve governmental action fixing or ignoring boundaries with discriminatory intent. The findings in the case before us are to the contrary. These cases are therefore distinguishable as are the boundary cases such as Morrilton, considered by this court. See Part IV, supra. These decisions upon which the Jenkins class so heavily relies, when viewed in light of the findings made by the district court, plainly have no applicability to the present case. The district court therefore correctly rejected arguments based upon them.
 
 VII.
 
 94
 To the contrary, other decisions relied upon by the district court carry great force. Lee v. Lee County Board of Education, 639 F.2d 1243, distinguishing Newburg and Evans, refused to impose an interdistrict remedy on truly autonomous local school districts. Taylor v. Ouachita Parish School Board, 648 F.2d 959, 966 (5th Cir.1981), also found autonomous school districts and an intradistrict violation as opposed to interdistrict violations. A showing of segregative effect alone was considered to be insufficient under Milliken without demonstration of interdistrict violation and interdistrict effect.
 
 
 95
 Goldsboro City Board of Education v. Wayne County Board of Education, 745 F.2d 324, presents many similarities to the case before us. The argument was made, similar to that advanced by the Jenkins class, that the district court erred in its legal ruling that the county board owed no duty to the city board to decrease the proportion of blacks in the city schools. Both the city and county school districts were unitary. The court in Goldsboro stated:
 
 
 96
 An independent school district which has not caused segregation in a neighboring independent district has no duty to rectify a racial imbalance in the other district. * * * Both the City and County were found to have unitary school systems. * * * Swann implies that once a school system is unitary it has no duty to go to extraordinary measures to compensate for demographic changes it did not cause or encourage.
 
 
 97
 Id. at 328-29 (citations omitted) (footnote omitted). Goldsboro rejected the argument that it violated the Constitution by maintaining separate county and city school districts which, while racially neutral when created, had in the face of demographic changes made the population of the city schools more black.[27]
 
 
 98
 The Atlanta case also involves facts similar to those before us. The decision of a three-judge court in Armour v. Nix, 16-708 (N.D.Ga.1979), aff'd, 446 U.S. 930, 100 S.Ct. 2146, 64 L.Ed.2d 784 (1980), denied an interdistrict remedy. Armour discussed particularly past conditions and practices and stressed the need for a current interdistrict effect. The holding in Armour was best summarized in Lee v. Lee County Board of Education, 639 F.2d 1243, as follows:
 
 
 99
 Armour involved the City of Atlanta school district and a number of suburban county districts in the metropolitan Atlanta area. The demographic pattern was a familiar one. The City of Atlanta, and its school system, has become smaller and predominantly black, as the surrounding suburban communities have expanded rapidly and become predominantly white. Given these residential patterns, no intradistrict desegregation plan promised any degree of meaningful racial integration of the public schools within the city district. In Armour, the court concluded that interdistrict relief would, nevertheless, be inappropriate because the current pattern of pervasive residential segregation, which the court found to be the proximate cause of the racial disparities in the population of the various districts, was not the direct result of any official action on the part of the school authorities or any other governmental agent.
 
 
 100
 Id. at 1259 (footnote omitted).
 
 
 101
 It is interesting to observe that the central thrust of the jurisdictional statement filed with the Supreme Court by appellant in Armour is based on acts of state actors causing housing segregation in the greater Atlanta area, which, it was argued should require an interdistrict remedy. The Supreme Court's summary affirmance of Armour, therefore, provides precedential guidance for us. Tully v. Griffin, 429 U.S. 68, 97 S.Ct. 219, 50 L.Ed.2d 227 (1976); Hicks v. Miranda, 422 U.S. 332, 343-45, 95 S.Ct. 2281, 2289-90, 45 L.Ed.2d 223 (1975).
 
 VIII.
 
 102
 Yet another reason gives strong support to the district court's denial of interdistrict relief. The district court, as we have observed on several occasions, made strong findings that the SSDs had become unitary and had eliminated all vestiges of the dual school system at least by the early 1960's.[28] This makes appropriate, as the district court correctly recognized, the Court's discussion in Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267:
 
 
 103
 At some point, these school authorities and others like them should have achieved full compliance with this Court's decision in Brown I. The systems would then be "unitary" in the sense required by our decisions in Green [v. County School Bd., 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968) ] and Alexander [v. Holmes County Bd. of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969) ].
 
 
 104
 It does not follow that the communities served by such systems will remain demographically stable, for in a growing, mobile society, few will do so. Neither school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition of student bodies once the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the system. This does not mean that federal courts are without power to deal with future problems; but in the absence of a showing that either the school authorities or some other agency of the State has deliberately attempted to fix or alter demographic patterns to affect the racial composition of the schools, further intervention by a district court should not be necessary.
 
 
 105
 Id. at 31-32, 91 S.Ct. at 1283-84.
 
 
 106
 The district court found that in the 1954-55 school year 18.9% of KCMSD's students were black and that the district was majority white in enrollment until 1970. Jenkins v. Missouri, 593 F.Supp. at 1492. The exhibit upon which these findings were based further demonstrates that the district became 30% black in the 1961-62 school year, 40% black in the 1965-66 school year, and 60% black in the 1975-76 school year. The significance of these findings is that the increase in black population in KCMSD accelerated after the SSDs eliminated the vestiges of the dual system and began operating unitary school systems. The situation is similar to that in Goldsboro, 745 F.2d at 328-29.
 
 
 107
 In Riddick, 784 F.2d 521, the court stated:
 
 
 108
 But once the goal of a unitary school system is achieved, the district court's role ends.
 
 
 109
 * * *
 
 
 110
 * * *
 
 
 111
 We have only recently examined both Pasadena [City Bd. of Ed. v. Spangler, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976) ] and Swann and concluded that a district court's power to effect additional remedial orders is limited. "Once a school system has achieved unitary status, a court may not order further relief to counter-act resegregation that does not result from the school system's intentionally discriminatory acts." Vaughns, [v. Bd. of Ed. of Prince George's Cty., 758 F.2d 983 (4th Cir.1985) ], supra, at 988. Other courts have reached the same conclusion. Davis, supra, 721 F.2d at 1435 ("Changes in neighborhood ethnicity taking place after school officials have transformed their system into a unitary one need not be remedied, of course, for school officials are under no duty to adjust for the purely private acts of those who chose to vote with their feet."); Ross v. Houston Independent School Dist., 699 F.2d 218, 225 (5th Cir.1983).
 
 
 112
 Id. at 535-37.
 
 
 113
 Thus, the findings of the district court that the SSDs had become unitary, and that only later did the KCMSD's black population grow, together with the explanation in Swann, compel the conclusion that there be no further intervention by federal courts with the SSDs.[29]
 
 IX.
 
 114
 The district court dismissed the claims that HUD, in administering housing policies and programs, had violated the Fifth Amendment of the United States Constitution, Title VI of the Civil Rights Act of 1964, 41 U.S.C. Sec. 2000d, et seq., Title VIII of the Civil Rights Act of 1968, 42 U.S.C. Sec. 3601, et seq., and various housing laws and regulations.
 
 
 115
 We have discussed briefly, in the housing context, the Jenkins class' claims against HUD. It claims that HUD violated its Title VI and Title VIII obligation by continuing to fund LCRA and HAKC after it knew that that agencies employed racially discriminatory housing practices, and by continuing to administer its section 8 housing program in a manner which is segregative in fact. Section 8 is a housing assistance payment program in which HUD issues certificates to low income renters who then present these certificates to landlords for rental payments. The Jenkins class maintains that HUD failed to direct the certificate recipients to integrative locations and, as a result, three-fourths of certificate holders rent in predominantly black housing units within the KCMSD. It further contends that HUD administered its section 235 single-family mortgage assistance program in a manner which funneled blacks into transitional areas of KCMSD and whites into the SSDs. Ultimately, the Jenkins class asserts, HUD allowed foreclosed section 235 housing in these transitional areas to deteriorate, thus contributing to white flight into the suburbs. They finally charge that although HUD abandoned its 1960s "social homogeneity" policy, it took no steps to encourage families benefiting from its housing programs to make integrative choices.
 
 
 116
 The district court addressed these contentions in denying the claims against HUD. The Jenkins class simply reasserts these claims on appeal. They do not assert that the district court's underlying factual findings are clearly erroneous. With respect to HUD's relationship with HAKC and LCRA, the court found, as we discussed above, that HUD investigated the violations and entered a cooperative agreement with those agencies and the City of Kansas City to correct the violations. The court found that HUD acted in a reasonable and responsive manner, that its conduct was not arbitrary and capricious, and concluded that there was no violation of plaintiffs' fifth amendment rights. Jenkins v. Missouri, 593 F.Supp. at 1498-99. Regarding section 8 certificate-holders, the court found no evidence that HUD attempted to direct these individuals into particular housing areas. With respect to the other siting issues, the district court found that HUD followed a balanced housing policy and, by assisting housing projects in the suburban area, attempted to ensure that housing located in inner-city areas was balanced. Id. at 1499. Further, it is again relevant that the section 235 program, authorized by the National Housing Act in 1968, began essentially after the massive shift in the racial population of southeast Kansas City had occurred. Record at 12048-49. Most of these schools had by then become predominantly black. The rapid racial turnover was attributed by plaintiffs' witnesses to a variety of non-HUD related factors and was considered by one of plaintiffs' expert witnesses to be inevitable. Record at 12034, 12061. Plaintiffs' expert, Dr. Gary Orfield, testified that by 1954 the KCMSD schools, like those of most central cities in the country, were on course to become predominantly black, regardless of the desegregation actions taken at that point. Record at 14891-93.
 
 
 117
 We conclude that plaintiffs' arguments do not show that the district court erred as a matter of law in its judgment for HUD. We affirm the district court's dismissal of the claims against HUD.
 
 X.
 
 118
 Finally, the KCMSD challenges the district court's ruling that for lack of standing KCMSD must be dismissed as a party plaintiff and realigned as a defendant. KCMSD argued that it sustained economic injury through the action of the other defendants and therefore had standing to seek recovery against them. The district court carefully considered this and other arguments urged by KCMSD to proceed as a party plaintiff. The court recognized a potential conflict between the interests of students seeking to demonstrate the existence of segregative conditions in the area, and those of the KCMSD, which would resist the introduction of incriminating evidence concerning its own past or present actions. School District of Kansas City, Mo. v. Missouri, 460 F.Supp. at 441. The findings of KCMSD liability in the Order of September 17, 1984, Jenkins v. Missouri, 593 F.Supp. at 1492-95, 1504, 1506, and the Order of June 14, 1985, confirm the concerns of the district court in October 1978 that a conflict of interest existed. The district court therefore did not err in dismissing KCMSD as a party plaintiff and realigning it as a defendant.
 
 XI.
 
 119
 We now consider the intradistrict remedy ordered by the district court. No one challenges the substantial portion in which the costs are divided evenly between the State and the KCMSD. These include a program to achieve the AAA rating which would include library improvement and teaching load and curriculum improvements and addition of counselors. The implementation of a summer school program and full-day kindergarten, before- and after-school tutoring, and an early childhood development program are the other remedial steps ordered by the district court. These programs impose a cost over a three-year period on both the State and KCMSD of $10,140,472 each.
 
 
 120
 The State, however, challenges an improved student achievement program which essentially involves grants to each of the schools in KCMSD for a three-year period, the voluntary interdistrict transfer plan, and the reduction of class size proposal, all of which involve costs to be imposed upon the State alone. We will consider each of these items in turn, as well as the capital improvements program which imposed a cost on the school district of $10,000,000 over a three-year period, and $27,000,000 on the State over the same period.
 
 
 121
 We have approved remedial and compensatory programs in school desegregation cases. See Liddell v. Missouri, 731 F.2d 1294. There we stated, in a portion of the opinion joined by eight judges of this court:
 
 
 122
 [T]o remedy the effects of a dual system which operated for decades with the sanction of law, remedial efforts must also concentrate on systemic educational improvements.
 
 
 123
 A secondary remedial objective of the quality education improvements is to enhance the appeal of the city school system, thereby promoting the chances of a stable and successful voluntary desegregation plan. The exodus of white parents and students out of fear of integration, or "white flight," is no excuse for school officials to avoid desegregating.
 
 
 124
 Id. at 1313 (emphasis in original) (citations omitted).
 
 
 125
 The district court properly recognized this principle when it stated in its Memorandum Opinion of June 14, 1985:
 
 
 126
 Measures requiring educational improvements have been incorporated into many desegregation remedies. * * * The use of ancillary programs to improve the educational quality of a school district in a desegregation remedy is based upon the federal district's "duty to render a decree which will so far as possible eliminate the discriminatory effects of the past...." * * * No party to this case has suggested that this plan should not contain components designed to improve educational achievement. In fact, it is "appropriate to include a number of properly targeted educational programs in a desegregation plan" (State Plan at 5). This is true because "individuals in our society who do not possess the levels of skill, literacy, and training essential to this new era will be effectively disenfranchised, not simply from the material rewards that accompany competent performance, but also from the chance to participate fully in our national life." A Nation at Risk at p. 7.
 
 
 127
 Memorandum Opinion of June 14, 1985 at 3-4 (citations omitted).
 
 
 128
 Recognizing these principles, a number of the programs designed to improve student achievement are not the subject of attack in this appeal before us.
 
 A.
 
 129
 The State argues that the voluntary interdistrict transfer plan imposes an interdistrict remedy for an intradistrict violation. The State concedes that this argument was rejected in Liddell, 731 F.2d 1294. This court there held, relying on its earlier decisions in the Liddell litigation, that a voluntary interdistrict program was a "valid part of the attempt to fashion a workable remedy within the city" and would be entirely enforceable against the State. Id. at 1303.[30]
 
 
 130
 Our holding in Liddell was the basis for the following findings of the district court:
 
 
 131
 To accomplish desegregation within the boundary lines of a school district whose enrollment remains 68.3% black is a difficult task. As this Court stated in its January 25, 1985 order, "because of restrictions on this Court's remedial powers in restructuring the operations of local and state government entities," any mandatory plan which would go beyond the boundary lines of KCMSD goes far beyond the nature and extent of the constitutional violation this Court found existed. * * * In addition, voluntary interdistrict transfers may serve to provide additional opportunities for desegregated schools as well as desegregative educational experiences for KCMSD students.
 
 
 132
 Order of June 14, 1985 at 31 (citations omitted).
 
 
 133
 The district court specifically found that the State had created the dual school system in Kansas City, that vestiges still lingered, and the obligations of KCMSD and the State to eliminate them have not been met. Jenkins v. Missouri, 593 F.Supp. at 1503-04. This finding of a constitutional violation, even though intradistrict in nature, is sufficient under the principles of Liddell to place upon the State the obligation to fund the voluntary interdistrict transfer program, under procedures enunciated in Liddell.
 
 
 134
 We believe, however, that the State properly raises a valid concern with respect to the requirement that the State pay KCMSD the full student foundation allotment for each student who transfers from KCMSD to a SSD. KCMSD, after all, has also been found to have violated the Constitution. We believe that the situation is not unlike that in St. Louis where both the State and the school district were constitutional violators in an intradistrict violation. There we approved payment by the State on one of two formulas, either one-half of the State aid the district would have received had the student not transferred, or, if a district sends more students than it receives, State aid based on the district's enrollment for the second prior year. Liddell, 731 F.2d at 1302. We also have concern that the court has given to the State alone full authority to monitor the voluntary interdistrict program. We believe that the use of a citizens committee in the St. Louis area with authority to monitor the program and assist in recruitment has been most effective. We direct that the district court modify its order on the voluntary interdistrict program so that it is consistent with that approved in Liddell.
 
 B.
 
 135
 The State argues that the district court improperly ordered it to fund an increase in the number of teachers above and beyond that necessary to meet AAA standards.[31] The district court found that "achieving reduced class size is an essential part of any plan to remedy the vestiges of segregation in the KCMSD." Memorandum Opinion of June 14, 1985 at 13.[32] The district court analyzed the school system in detail ordering an increased number of teachers so as to reach the achieved class size goals. It placed the entire burden of this cost on the State and required that any responsibility beyond the minimal goals would be borne by KCMSD. The order contains no findings specifically directed to the issue of the liability of the State for this cost as opposed to that of KCMSD. We believe this portion of the order is infirm in two respects. First, it goes beyond the scope of our order in Liddell, which approved the requirements that would bring the schools within the AAA standing, but only as applied to the non-integrated schools. It also runs counter to the Liddell provision for funding equally divided between the State and the school district. 731 F.2d at 1318. As we have observed, both KCMSD and the State are constitutional violators. We see no reason for this cost being placed solely on the State. We direct the district court to modify that portion of its order dealing with reducing elementary and secondary school class size so as to divide the cost equally between the KCMSD and the State.
 
 C.
 
 136
 The State also objects to that part of the court's order providing for an effective school program, with the goal of improving student achievement, to be funded entirely by the State. This program provides specific grants for each school, in an amount higher for those with 90% or more black enrollment. Over three years, it totals $17,000,000.
 
 
 137
 The district court made detailed findings with respect to the first year's expenditures and the components to be considered that year, and ruled that later years would be determined by a school advisory committee at each school making recommendations to the School Board. Memorandum Opinion of June 14, 1985 at 22. The goals of the program were to be directed toward improvement of elementary reading and improving the pass rate on the BEST on the secondary level. We have no difficulty concluding that the findings of the district court support the creation of this fund as its purpose is to provide programs that would enhance education. Nevertheless, we see no findings in the district court order that in any way substantiates placing the entire burden of this program on the State. We believe that the cost should be shared equally between the State and KCMSD and direct that the district court modify its order in this respect.
 
 D.
 
 138
 The State argues that it should not be required to furnish $27,000,000 toward a $37,000,000 capital improvement program.
 
 
 139
 The district court found that the average age of the sixty-eight school buildings utilized by KCMSD is fifty-eight years and that improvement of school facilities is an important factor in the overall success of the desegregation plan. The district court said:
 
 
 140
 Specifically, a school facility which presents safety and health hazards to its students and faculty serves both as an obstacle to education as well as to maintaining and attracting non-minority enrollment. Further, conditions which impede the creation of a good learning climate, such as heating deficiencies and leaking roofs, reduce the effectiveness of the quality education components contained in this plan.
 
 
 141
 Memorandum Opinion of June 14, 1985 at 34.
 
 
 142
 These findings of the district court are sufficient to support its conclusion that capital improvements are necessary for successful desegregation. The State raises a troublesome argument based upon the finding of the district court that the buildings in the school district were in need of repair because of deferred maintenance and the failure to maintain the buildings. It argues that this was not the result of an unlawful action by the State. Nevertheless, we believe that the district court findings establish the propriety of this portion of the remedy and because the State is a constitutional violator, it has the obligation to support its proportionate share of this aspect of the remedy. Once again, however, we believe that the equal division between the State and KCMSD, both constitutional violators, is more equitable, and is consistent with our earlier opinion. See Liddell 731 F.2d at 1318-19.
 
 
 143
 Further findings support our view. The district court found that the deferred maintenance was a result of KCMSD's lack of financial resources as evidenced by its inability to pass a capital improvements bond issue, although several attempts had been made since 1965. Memorandum Opinion of June 14, 1985 at 33. This is not unlike the situation in St. Louis where only one bond issue was passed in the last twenty-four years and thirteen were rejected. We are troubled with the district court's reasoning in which it takes into consideration the expenditure by KCMSD of $15,000,000 to $18,000,000 for implementation of an earlier desegregation plan for which it was not reimbursed and for its budgeting in the 1986 fiscal year of approximately $17,000,000 for desegregation programs not covered in the plan. The State argues that to apply such payments to justify additional contribution by the State is similar to the equitable restitution for payments unlawfully withheld in the past, which were condemned as contrary to the Eleventh Amendment by the Supreme Court in Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). In view of our conclusion that these costs should be shared equally by the State and KCMSD prospectively, we need not give further consideration to this troublesome issue.
 
 E.
 
 144
 The State makes a final argument that the total cost of the funding placed approximately 80% on the State and only 20% on KCMSD. Our discussion of the specific items above and our conclusion that these costs should be shared equally by KCMSD and the State obviate our further consideration of these arguments. We have already pointed to the role of both as constitutional violators and we need not catalog further the acts of the State or of KCMSD that causes liability to be placed upon each entity. Equal division of costs between the local school authorities and the State was approved in Milliken v. Bradley, 433 U.S. 267, 277, 97 S.Ct. 2749, 2755, 53 L.Ed.2d 745 (1977); Penick v. Columbus Board of Education, 519 F.Supp. 925, 942 (S.D.Ohio), aff'd, 663 F.2d 24 (6th Cir.1981), cert. denied, 455 U.S. 1018, 102 S.Ct. 1713, 72 L.Ed.2d 135 (1982); and Reed v. Rhodes, 500 F.Supp. 404, 424-26 (N.D.Ohio 1980), aff'd, 662 F.2d 1219 (6th Cir.1981), cert. denied, 455 U.S. 1018, 102 S.Ct. 1713, 72 L.Ed.2d 135 (1982).
 
 
 145
 We observe also that the record before the district court demonstrates that KCMSD has a higher property valuation than those in the SSDs[33] and that KCMSD has imposed upon itself a below average rate of tax levy. KCMSD had a levy of $3.43 per $100 while the other districts in the Kansas City metropolitan area had an average levy of $4.28. This real estate tax falls upon a property base, a great portion of which is highly developed commercial real estate, as opposed to single family homes occupied by students in KCMSD.
 
 
 146
 We are aware of the complexities of the State's funding of Missouri schools. While the district court made no findings on this subject, a memorandum filed by the State discusses the procedure established in Chapter 163, R.S.Mo, in great detail. The wealth of the school district plays a considerable role in determining the working of the State formula. As the formula deals entirely with distribution of funds, we believe that, should the district court determine it to be desirable, further consideration could be given to the working of this formula, particularly in reference to desegregation plans in the case now before us, and that in St. Louis, which we treated in Liddell, to determine whether there is any discriminatory motive or action in application of the formula and distribution of funds to school districts.
 
 
 147
 While our decision places greater financial obligation on KCMSD, it is our intention that the remedy ordered by the court be fully funded. We discussed in detail methods available to the district court to achieve this goal in Liddell, 731 F.2d at 1319-23.
 
 CONCLUSION
 
 148
 One further comment is in order. The record demonstrates in a number of areas that insofar as "white flight" may have been a factor in the Kansas City area, it cannot be considered without reference to the schools in the neighboring State of Kansas. This aspect of the case was not developed in detail nor did the court find it necessary to make findings on this issue. Nevertheless, it is a fact that might at some appropriate time in the future need to be given consideration in evaluating the segregation that may exist in the greater Kansas City area. Certainly, it would be appropriate and desirable, although we admit complex, to give careful consideration to inclusion of the Kansas schools in any voluntary interdistrict plan.
 
 
 149
 We affirm the judgment of the district court in favor of the SSDs and affirm the judgment of the district court and its intradistrict remedy imposed upon the State and the KCMSD with the exceptions we have discussed above that equalize the cost between the State and KCMSD.
 
 
 150
 ROSS, Circuit Judge, concurring.
 
 
 151
 I concur in Judge Gibson's opinion but write separately to emphasize to the parties in this case the importance of the admonition in footnote 30.
 
 
 152
 At the time of argument it was my understanding that a voluntary interdistrict program, patterned along the lines of the St. Louis program was a real possibility. It would now appear that some of the districts are not moving forward with this plan.
 
 
 153
 In my opinion the failure to organize and implement this program would be a very significant factor in determining discriminatory intent in the future litigation which is certain to result from the further processing of this case. The St. Louis program would be a useful model for the actions to be taken by all the Missouri districts which are parties to this action.
 
 
 154
 ARNOLD, Circuit Judge, concurring in part and dissenting in part.
 
 
 155
 While I concur in much of what the Court has said today, I must respectfully dissent from those portions of the lead opinion concerning suburban school district (SSD) participation in a remedy for the interdistrict effects of the State of Missouri's housing violations. In all other respects, I concur in the judgment.
 
 
 156
 I would hold that the District Court erred in concluding that the SSDs cannot be required to participate in an interdistrict remedy for interdistrict school segregation caused by the State's constitutional violations in the area of housing. The case should be remanded to the District Court for determination of the current interdistrict effects, if any, of the State's housing violations. Any SSDs implicated by this analysis should be obliged to partipate in an appropriately tailored interdistrict remedy.
 
 I.
 
 157
 The District Court was of the view that no SSD could be made to take part in an interdistrict remedy unless there had been "a racially discriminatory act by [the SSD] that substantially caused segregation in another district." Opinion of June 5 at 6, citing Milliken v. Bradley, 418 U.S. 717, 745, 94 S.Ct. 3112, 3127, 41 L.Ed.2d 1069 (1974). The District Court concluded that because the housing discrimination at issue here was perpetrated by the State and other governmental entities, rather than by the SSDs, the SSDs cannot be allotted a mandatory role in an interdistrict remedy for any resulting school segregation. Opinion of June 5 at 42.
 
 
 158
 This position involves a misconstruction of Milliken. In a passage which expresses the core of Milliken, Chief Justice Burger wrote:
 
 
 159
 The controlling principle consistently expounded in our holdings is that the scope of the remedy is determined by the nature and extent of the constitutional violation. Swann [v. Charlotte-Mecklenburg Board of Education], 402 U.S. , at 16 [91 S.Ct. 1267, at 1276, 28 L.Ed.2d 554] (1971). Before the boundaries of separate and autonomous school districts may be set aside by consolidating the separate units for remedial purposes or by imposing a cross-district remedy, it must first be shown that there has been a constitutional violation within one district that produces a significant segregative effect in another district. Specifically, it must be shown that racially discriminatory acts of the state or local school districts, or of a single school district have been a substantial cause of interdistrict segregation.
 
 
 160
 418 U.S. at 744-45, 94 S.Ct. at 3127 (emphasis added). Numerous other portions of Milliken further evidence the Court's view that an interdistrict remedy involving a school district may be based on discriminatory acts of the state or other school districts with interdistrict segregative effects on the school district in question. See, e.g., id. at 745, 94 S.Ct. at 3127 ("With no showing of significant violation by the ... outlying school districts and no evidence of any interdistrict violation or effect" (emphasis added), an interdistrict remedy was improper); id. at 748, 94 S.Ct. at 3129 (interdistrict relief unjustified because "... there has been no showing that either the State or any of the ... outlying districts engaged in activity that had a cross-district effect." (emphasis added)); id. at 750-751, 94 S.Ct. at 3130 (discussing state activities as possible bases for interdistrict relief).
 
 
 161
 As support for the District Court's decision regarding housing, the lead opinion cites the discussion of Milliken in Hills v. Gautreaux, 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976).[1] Yet, Hills states that the Court in Milliken rejected an interdistrict remedy because, while the trial court had found that "constitutional violations committed by the Detroit School Board and State officials had contributed to racial segregation in the Detroit schools, ... there had been neither proof of unconstitutional actions on the part of neighboring school districts nor a demonstration that the Detroit violations had produced significant segregative effects in those districts." Id. 418 U.S. at 792, 94 S.Ct. 3150 (emphasis added). Further, in the portion of Hills quoted by the Court, ante at 671, the Supreme Court states: "In Milliken, there was no finding of unconstitutional action on the part of the suburban school officials and no demonstration that the violations committed in the operation of the Detroit school system had had any significant segregative effects in the suburbs." 425 U.S. at 294, 96 S.Ct. at 1544 (emphasis added).[2]
 
 
 162
 Thus, it is not necessary that each school district subjected to an interdistrict remedy have itself committed a constitutional violation.[3] Instead, Milliken establishes that an interdistrict remedy is justified wherever discriminatory actions of either the state, or local school districts, or both, have had significant interdistrict segregative effects. The SSDs
 
 
 163
 may not maintain that their districts should be excluded from any interdistrict remedy if they are found innocent of committing any constitutional violations because they should not be held responsible for the acts of the state legislators or other state subdivisions such as a local housing authority or a zoning board. The commands of the Fourteenth Amendment are directed at the state and cannot be avoided by a fragmentation of responsibility among various agents. Cooper v. Aaron, 358 U.S. 1, 15-17, [78 S.Ct. 1401, 1408-09, 3 L.Ed.2d 5] (1958).
 
 
 164
 United States v. Board of School Commissioners, 573 F.2d 400, 410 (7th Cir.), cert. denied, 439 U.S. 824, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978) (emphasis added).[4]
 
 
 165
 Perhaps the paradigm case in which a state's constitutional violation merits interdistrict relief even absent participation by the local school district in the violation is where the state draws boundary lines on the basis of race. See, e.g., Morrilton School District No. 32 v. United States, 606 F.2d 222, 228 & n. 5 (8th Cir.1979) (en banc); Hoots v. Commonwealth of Pennsylvania, 672 F.2d 1107, 1119-21 (3d Cir.1982). But a state's actions also merit an interdistrict remedy where it or its subdivisions cause interdistrict school segregation by employing discriminatory housing laws, policies, or practices. "[W]here the state has contributed to the separation of the races ... by purposeful, racially discriminatory use of state housing or zoning laws," it may be appropriate to enter "a decree calling for transfer of pupils across district lines or for restructuring of district lines." Milliken, 418 U.S. at 755, 94 S.Ct. at 3132 (Stewart, J., concurring) (emphasis added).
 
 
 166
 Thus, I take it as established that a school district can be made to participate in an interdistrict remedy even if it is not "personally" guilty of violating the Constitution, that such relief is appropriate where a State's constitutional violations have contributed to interdistrict segregation, that "State" for this purpose includes any state or local agency, and that there is nothing unique or peculiar about housing agencies that would take them out of this rule. These conclusions are established, not only by Milliken itself and the other authorities just discussed, but also by our own unanimous en banc opinion in Morrilton School Dist. No. 32 v. United States, supra. There, the Morrilton and Plumerville school districts argued that "since the government made no showing that either Morrilton or Plumerville participated in the development of the East Side District as a segregated district, the District Court's imposition of interdistrict relief was unwarranted." 606 F.2d at 225. We squarely rejected that argument:
 
 
 167
 Morrilton and Plumerville argue that since there was no evidence implicating them in a direct way with the establishment of the East Side District, the court has no authority to order them to remedy the state's wrong. This argument is clearly without merit since the effects of the unconstitutional state action are felt in both districts.
 
 
 168
 606 F.2d at 228 (footnote omitted). We then quoted the very passage, explicitly mentioning housing, from Board of School Commissioners, 573 F.2d at 410, a portion of which I have already quoted. In light of this en banc opinion, which of course authoritatively states the law of this Circuit until and unless overruled, I do not know how the District Court's position--that the SSDs, because individually guiltless, cannot be made part of an interdistrict remedy--can stand.[5]
 
 
 169
 The Supreme Court has recognized on a number of occasions that there is a close reciprocal relationship between residential patterns and the racial composition of schools. See, e.g., Keyes v. School District No. 1, 413 U.S. 189, 202, 93 S.Ct. 2686, 2694, 37 L.Ed.2d 548 (1973); Swann, 402 U.S. at 20-21, 91 S.Ct. at 1278-79. The District Court here found that "there is an inextricable connection between schools and housing." 593 F.Supp. at 1491. Other federal courts have ordered school districts to participate in interdistrict remedies based in part upon housing discrimination practiced by other branches of state government. See Evans v. Buchanan, 393 F.Supp. 428, 434-38 (D.Del.) (three-judge court), aff'd, 423 U.S. 963, 96 S.Ct. 381, 46 L.Ed.2d 293 (1975); United States v. Board of School Commissioners, 456 F.Supp. 183, 188-92 (S.D.Ind.1978), aff'd in part and vacated in part on other grounds, 637 F.2d 1101, 1109-16 (7th Cir.), cert. denied, 449 U.S. 838, 101 S.Ct. 114, 66 L.Ed.2d 45 (1980). This Court should demonstrate no less concern for the segregative effects of state housing violations upon schools. When a state segregates children on a multi-district basis, whether it does so by drawing boundary lines or by steering or restricting the races to homes on different sides of pre-existing lines, the courts can provide interdistrict relief that includes all affected districts. See generally, Note, Housing Discrimination as a Basis for Interdistrict School Desegregation Remedies, 93 Yale L.J. 340 (1983).[6]
 
 II.
 
 170
 Having concluded that an SSD may be required to participate in an interdistrict remedy for any interdistrict effects of housing discrimination upon the SSD, I turn to the question whether the State or its subdivisions have committed any housing violations that have current interdistrict segregative effects. In its September 17, 1984 opinion, 593 F.Supp. 1485, the District Court found or referred to a number of instances of housing discrimination by the State and its subdivisions that could have had such segregative effects. However, examination of that opinion and of the District Court's June 5, 1984 opinion, in which it granted the SSDs' Rule 41(b) motions, persuades me that the District Court never finally determined whether or what current interdistrict segregation is attributable to these housing violations. Having concluded that the SSDs could not be required to participate in an interdistrict remedy, assessing the interdistrict effects of housing discrimination by the State was a task the District Court no longer found necessary. Although the principal opinion asserts that the District Court made findings that foreclose the possibility of interdistrict effects, the findings that it cites are largely not on point and do not resolve the question. The lead opinion's arguments on this point are in essence an exercise in appellate factfinding, an exercise that is unjustified since the record here is hardly so one-sided as to make any alternate findings clearly erroneous. This determination has not yet been made by the District Court, and must be before the book can be closed on the SSDs' liability to interdistrict relief.
 
 
 171
 Perhaps the clearest, most direct example of the State of Missouri's discrimination in the area of housing is the enforcement by its courts of racially restrictive covenants. See 593 F.Supp. at 1497. Even after state enforcement of such covenants was held unconstitutional in Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), Missouri's courts continued to entertain damage actions for breach between parties to the covenant, see Weiss v. Leaon, 359 Mo. 1054, 225 S.W.2d 127 (1949), a practice the Supreme Court held unconstitutional in Barrow v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953). Further, the District Court found that the State had in the past taken numerous other actions that were discriminatory against blacks, such as mandating separate schools for blacks and whites, Mo. Const. Art. IX, Sec. 1(a) (1945) (rescinded 1976), Secs. 163.130, 165.117 R.S.Mo. (repealed 1957); providing that school boards could establish separate libraries, parks, and playgrounds for whites and blacks, Sec. 165.327 R.S.Mo. (1959); and making it a crime for a person of one-eighth Negro blood to marry a white person, Sec. 563.240 R.S.Mo. (1959). 593 F.Supp. at 1503. "These actions," the District Court found, "had the effect of placing the state's imprimatur on racial discrimination." Id. Thus, the state "created an atmosphere in which the private white individuals could justify their bias and prejudice against blacks," and "encouraged racial discrimination by private individuals in the real estate, banking, and insurance industries." Id. The District Court concluded that "[t]his has and continues to have a significant effect on the dual housing market in the Kansas City area." Id.[7]
 
 
 172
 A predicate for interdistrict relief may also be found in discriminatory housing practices of the LCRA and the HAKC, which are both instrumentalities of state government for whose discrimination the State of Missouri is accountable.[8] Since it had determined that the SSDs could not be required to participate in an interdistrict remedy, and since it had found other bases for State intradistrict liability, the District Court considered these two entities only in connection with claims against HUD. Nonetheless, it appears from the Court's findings, as well as from evidence not addressed by the Court because it was not directly relevant to HUD's liability, that these agencies have committed housing violations that may have interdistrict segregative effects. Between 1953 and 1973, LCRA practiced discrimination in relocating persons displaced by urban renewal, steering blacks to southeastern Kansas City and relocating whites throughout the city. 593 F.Supp. at 1497-98. It appears that HAKC explicitly segregated its housing units until 1958, and that, despite the nominal adoption of a "freedom of choice" tenant-selection policy, HAKC may have continued segregative practices until 1964. Brief of Plaintiffs-Appellants Kalima Jenkins, et al., at 24; Brief of Defendant-Appellee Department of Housing and Urban Development at 11.[9] Like Missouri's enforcement of racially restrictive covenants and encouragement of private discrimination, the discriminatory practices of LCRA and HAKC could have significantly affected the dual housing market in the Kansas City area; if these practices have current interdistrict segregative effects, they merit interdistrict relief.[10]
 
 
 173
 The District Court did find that the State's own discrimination had contributed significantly to the dual housing market in "the Kansas City area," 593 F.Supp. at 1503, and that "the dual housing market ..., which still exists to a large degree today ..., impacted blacks in the KCMSD and consequently caused the public schools to swell in black enrollment." 593 F.Supp. at 1491. But the Court provided no more precise findings on the question of to what extent black students were concentrated in the portion of Kansas City covered by the KCMSD rather than more evenly dispersed through the portions of the Kansas City area served by the SSDs. Nor did the District Court assess the interdistrict segregative effects of housing discrimination by the LCRA or HAKC. Again, because the District Court concluded that the SSDs could not be made to help remedy the violations of independent housing actors, it had no need to determine whether the State's housing violations have current interdistrict segregative effects.
 
 
 174
 The plurality does not contend, by and large, that the District Court addressed this issue directly, but instead contends only that a number of findings that the Court made in other contexts somehow negate the possibility of significant interdistrict effects. First, it is argued at various points that the fact that the SSDs have operated unitary school systems since a few years after Brown precludes the possibility that housing violations have caused interdistrict segregation. E.g., ante at 669-70, 680-681. However, it is difficult to fathom how the fact that a school district is internally unitary indicates that school children have not been segregated on an interdistrict basis; that an SSD's schools are integrated with respect to children who live in the SSD has little bearing on whether, due to State housing discrimination, more whites and/or fewer blacks live in the SSD, and, concomitantly, fewer whites and/or more blacks live in KCMSD, than would otherwise be the case. If the SSDs had not been unitary, their own discrimination might have added to any State-fostered interdistrict segregation that exists; that they are unitary indicates only that they have not augmented interdistrict segregation caused by state housing violations. Unitary SSDs are no longer under an obligation to undo intradistrict segregation, Swann, 402 U.S. at 31-32, 91 S.Ct. at 1283-84, but they still may be required to participate in a remedy for the current segregative effects of interdistrict segregation.
 
 
 175
 Next, the plurality argues that the District Court "was plain" that the State's pre-1948 enforcement of restrictive covenants has no current significant segregative effect. Ante at 675 & n. 22. While I agree that the District Court made findings that dispose of the issue as to several of the SSDs, as to most of the SSDs the District Court did not make findings that are adequate to resolve the question whether present residential patterns would be significantly less segregated had restrictive covenants not been enforced. I agree with the lead opinion that there are no current segregative effects attributable to racially restrictive covenants in the Fort Osage School District, since there was no evidence of any such covenants located in that district, see Opinion of June 5 at 51; a similar conclusion is probably justified as to the Park Hill School District, see id. at 90. As to the nine remaining SSDs, however, I cannot agree that the District Court made findings sufficient to support a conclusion that the State's enforcement of restrictive covenants has caused no current interdistrict segregation. First, in each portion of the District Court's opinion discussing the restrictive covenants in a particular SSD, the District Court emphasizes the lack of SSD complicity in the placement or enforcement of the covenants within its boundaries. See, e.g., Opinion of June 5 at 48 (Center School District); id. at 73 (Lee's Summit School District). Thus, the District Court's misconstruction of Milliken may have tainted its consideration of the restrictive-covenant problem.
 
 
 176
 Even were this difficulty absent, the District Court's remaining findings are still not adequate to support a finding of no current effect. As to the Center, Hickman Mills, and Raytown School Districts, the District Court noted that there was no evidence of any black family that failed to move into the districts because of the covenants, and that there is no present barrier to black movement into the districts. Id. at 48, 58-59, 94. With regard to the Lee's Summit, Independence, and Liberty School Districts, the Court found that there were relatively few restrictive covenants in the districts, and that there was no evidence of any black family that failed to move into the district due to restrictive covenants. Id. at 66, 73, 77-78. Finally, the District Court observed that there were few racially restrictive covenants in the Grandview and North Kansas City School Districts, and that the effect of such covenants in these districts and the Blue Springs School District is limited or mooted by extensive post-Shelley residential development in those districts.
 
 
 177
 None of these findings resolves the question whether fewer blacks or more whites reside in the SSDs due to pre-Shelley and pre-Barrow enforcement of restrictive covenants. That there is no present barrier to black movement into an SSD hardly demonstrates that there was no barrier to such movement in the past that has current effects. That extensive post-Shelley residential development has occurred does not mean that earlier enforcement of racial covenants has not helped make a district identifiably white and inhospitable to blacks, or that it has no other current effect on residential patterns. Finally, it was not necessary for the plaintiffs to give evidence of particular black families that did not move into a district due to restrictive covenants in order to demonstrate the segregative effect of such covenants; to hold that they had no segregative effect on this basis simply blinks reality.
 
 
 178
 Further, the District Court did not determine the current effects of the State's continued efforts to give legal force to these covenants from 1948 to 1953, and, more importantly, the imprimatur that the State placed upon private housing discrimination by ordaining various forms of racial discrimination, see supra at 690-91.[11]
 
 
 179
 Finally, the plurality contends for two reasons that there can be no current interdistrict effects of housing violations by LCRA and HAKC. First, it cites the District Court's finding that HUD followed a balanced housing policy, locating federally funded housing in both KCMSD and in the SSDs, and that HUD's site-selection-and-approval practices had not affected the racial make-up of KCMSD schools. Ante at 676, citing 593 F.Supp. at 1499. Second, the lead opinion contends that the LCRA and HAKC practices of which the plaintiffs complain occurred in the 1970s, after KCMSD had experienced a substantial increase in black population. Ante at 676. Both of these points involve a misapprehension of the plaintiffs' claims: As to the first, the claim is not that unbalanced housing site selection and approval caused interdistrict segregation, but instead, that once the projects were built, HAKC explicitly segregated them, or later, steered whites to some projects and blacks to others. As to the second, the plaintiffs' complaint is not primarily about HAKC and LCRA activities in the 1970s; rather, the District Court found that LCRA practiced discrimination from 1953 to 1973, and the plaintiffs contend that HAKC segregated its housing units from its inception in 1939 until as late as the mid-1960s. See supra at 691.
 
 
 180
 I agree with Judge Gibson that there are many factors other than housing discrimination that may have contributed substantially to the present concentration of blacks in the KCMSD. See ante at 674-75. Insofar as economic and demographic factors unrelated to official discrimination caused interdistrict residential segregation, the State and the SSDs may not be required to remedy the concomitant interdistrict school segregation. See Pasadena City Board of Education v. Spangler, 427 U.S. 424, 433-37, 96 S.Ct. 2697, 2703-05, 49 L.Ed.2d 599 (1976). I also agree that there are geographic limitations on the effects of housing discrimination, and that some of the effects of the State's constitutional violations may have been felt in Kansas, rather than in the Missouri SSDs. See ante at 678. But the District Court has not yet made any findings on these points, as well as many other issues bearing on the question of interdistrict segregative effects, and as the lead opinion itself observes, the District Court is " 'uniquely situated' " to assess such matters. Ante at 671, quoting Little Rock, 778 F.2d at 410-11; see Morrilton, 606 F.2d at 230.
 
 
 181
 Therefore, the case should be remanded to the District Court to determine precisely what current interdistrict segregative effects may be attributed to housing discrimination by the State, LCRA, and HAKC. Upon remand, the District Court should first consider this question from the perspective of the SSDs' Rule 41(b) motions. Any SSD that does not prevail on its motion should be permitted to present evidence to rebut a finding that it is implicated in the current interdistrict segregative effects of the housing violations. While the SSDs were given the opportunity to continue to participate in the proceedings after the District Court granted their Rule 41(b) motions, this was not "a meaningful opportunity for [the SSDs] to present evidence ... on the propriety of a multidistrict remedy." Milliken, 418 U.S. at 721-22, 94 S.Ct. at 3116. After the District Court had held that the SSDs could not be made part of a remedy for the constitutional violations of other governmental entities, the SSDs no longer had any reason to take part in the suit. Therefore, were this Court to reverse the District Court on this issue, the SSDs would be entitled to present evidence.
 
 
 182
 If, at the end of these proceedings, the District Court found current segregative effects of the housing discrimination, it should then formulate an appropriately tailored interdistrict remedy, a remedy including each affected SSD. I caution, however, that, in accord with the equitable principles that govern such remedies, Milliken, 418 U.S. at 737-38, 94 S.Ct. at 3123-24, the role that may be assigned to each SSD may be limited by the fact that the SSD is not itself a constitutional violator. Thus, it would likely be inappropriate to burden the SSDs, rather than the State, with the financial costs of the remedy. On the other hand, it seems clear that affected SSDs could be required to participate in an interdistrict transfer program designed to make the racial composition of the districts' schools what it would have been absent official housing discrimination.
 
 III.
 
 183
 I conclude that an SSD, even if its own actions are without blemish, may be required to participate in an interdistrict remedy for the housing discrimination of the State of Missouri or its subdivisions, so long as that discrimination has current interdistrict segregative effects involving the SSD. The case should, in my view, be remanded to the District Court to determine whether the established constitutional violations of the State and the LCRA, as well as the possible violations of the HAKC, have had any such effects. If the District Court finds that this discrimination has produced interdistrict segregation, it should fashion a remedy which accords with the principles discussed in this opinion.
 
 
 184
 Insofar as Judge Gibson's opinion departs from this view, I dissent; in all other respects I concur. It is appropriate to add that, although the plurality opinion in this case of course announces the judgment, it does not make law for this Circuit except in those respects that command a majority vote of the judges sitting in this case. Four judges seem to agree that school districts not individually guilty of constitutional violations may not be compelled to participate in an interdistrict remedy. Four do not. That question is therefore open for determination in future cases in this Circuit.
 
 
 185
 LAY, Chief Judge, with whom HEANEY and McMILLIAN, Circuit Judges, join, dissenting.
 
 
 186
 A world of rhetoric cannot hide the world of fact.[1] No one can deny that the school systems within the Kansas City metropolitan area were racially segregated before 1954, continued to be segregated after 1954, and that virtually all remain segregated today. The clearly erroneous rule, used by the lead opinion to give blanket approval to the district court's conclusions, was never intended to be a rule of blind deference. This is particularly true when, as here, the record does not support the district court's conclusions. This court's affirmance of the district court, if allowed to stand, destines the Kansas City metropolitan area to racially segregated schools and a segregated community for decades to come. The lead opinion ignores Supreme Court precedent and brushes aside thirty years of this circuit's rulings mandating school integration.[2] The lead opinion also fails to acknowledge the district court's misunderstanding of Milliken v. Bradley, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974), and the resulting erroneous legal premises on which the district court's conclusions are based. The effect of this pervasive error makes the lead opinion's analysis largely irrelevant to the record before us.
 
 
 187
 It now remains for the people of metropolitan Kansas City to choose whether their community and school systems shall continue to foster an environment of racial separation. Although many might respond that freedom of choice is essential to democratic government, this proposition should be accepted only so long as equality of opportunity is not denied to those who do not have the majority will on their side. Here, the tragedy of the legalized discrimination of the past century is that it has resulted in continued denial of acceptable equal opportunities to both the black and white children in the Kansas City area. The lead opinion closes its eyes both to Missouri's long history of legally-mandated segregation of and discrimination against blacks and to the uncontroverted evidence at trial that showed that for decades only the Kansas City metropolitan school district (KCMSD) provided blacks in the Kansas City metropolitan area with any educational opportunity at all. Moreover, for much of the period during which the suburban population dramatically increased, blacks were precluded by law or otherwise discouraged from residing anywhere other than the southeast corridor of the KCMSD.
 
 
 188
 Although a district court's findings of fact may not be overturned unless clearly erroneous, Fed.R.Civ.P. 52(a), an appellate court nevertheless has the power to correct errors of law, including factual findings that are predicated on a misunderstanding of the governing rule of law. Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 501, 104 S.Ct. 1949, 1959-60, 80 L.Ed.2d 502 (1984) (quoted in In re Martin, 761 F.2d 472, 475 (8th Cir.1985)). Where, as here, the district court's factfinding process was tainted with legal error from the start of trial by the court's erroneous application of controlling legal principles, the district court's findings are entitled to less than usual deference and should be reversed as clearly erroneous.[3]
 
 
 189
 The district court's own conclusions and the clear weight of the uncontradicted evidence establish that constitutional violations, committed by the suburban school districts (SSDs) and HUD as well as the State of Missouri and the KCMSD, have caused significant continuing segregative effects in the SSDs. I would reverse the district court's dismissal of the SSDs and HUD, holding that the plaintiffs have made out a prima facie case for interdistrict relief; I would remand for further evidentiary hearings with the SSDs and HUD reinstated as parties, with directions that new findings be made in light of this opinion and any further evidence produced. Thereafter, if the overall evidence so indicates, the district court should fashion an appropriate interdistrict remedy which incorporates the SSDs and takes into consideration the liability of HUD. The result of our divided vote is to endorse the district court's fragmentation of the plaintiffs' evidence and its refusal to draw obvious inferences from that evidence and to thereby uphold the district court's denial of any form of interdistrict relief, the remedy most likely to eradicate the effects of years of legalized segregation in the Kansas City metropolitan area.
 
 
 190
 Several fundamental errors compel reversal of the district court's dismissal of the SSDs and HUD. I join Judge Arnold in his conclusion that the district court erroneously interpreted Milliken v. Bradley to require that each SSD have separately committed a constitutional violation with interdistrict effects before it could be included in an interdistrict remedy. Unlike Judge Arnold, I would hold that this error encompasses more than the housing violations claim but instead infects all of the district court's findings. Rather, I would hold that the district court erred in failing to find that the SSDs committed constitutional violations with continuing significant interdistrict effects. I would hold too that the district court erred in drawing the conclusion that the constitutional violations by the state and the KCMSD have no, or at most de minimis, continuing segregative effects on the SSDs, a finding that was falsely premised on the district court's misapplication of Milliken and on the district court's failure to adhere to the record as developed at trial.
 
 
 191
 The District Court's Misconstruction of Milliken v. Bradley
 
 
 192
 First, as discussed in Judge Arnold's opinion, the district court misconstrued Milliken when it concluded that Milliken precludes interdistrict relief in a racially segregated metropolitan area unless each school district is found to be a constitutional violator and by that violation to have caused a significant segregative effect in another district. As Judge Arnold notes, in its memorandum opinion and order dismissing the SSDs the district court prefaced discussion of the plaintiffs' legal theories regarding SSD liability with the incorrect statement that "[t]he linchpin of an interdistrict case, as declared by the Supreme Court, is whether there has been a racially discriminatory act by each defendant that substantially caused segregation in another district."[4] Jenkins v. State of Mo., No. 77-0420-CV-W-4, slip op. at 5-6 (W.D.Mo. June 5, 1984) (emphasis added), citing Milliken, 418 U.S. at 745, 94 S.Ct. at 3127. The Supreme Court's precise language in Milliken differs significantly from this gloss by the district court and actually reads:
 
 
 193
 [I]t must first be shown that there has been a constitutional violation within one district that produces a significant segregative effect in another district. Specifically, it must be shown that racially discriminatory acts of the state or local school districts, or of a single school district have been a substantial cause of interdistrict segregation.
 
 
 194
 Milliken, 418 U.S. at 744-45, 94 S.Ct. at 3127 (emphasis added). The district court thus erected an improper proof burden for the plaintiffs to overcome. Ironically, that the district court's interpretation of Milliken has never been the legal standard by which grants of interdistrict relief have been measured was recognized even by the defendant State of Missouri, which correctly restated the Milliken standard in its brief on appeal to this court.[5]
 
 
 195
 In affirming the district court's incorrect interpretation of Milliken, the lead opinion ignores the established precedent of this circuit. In Morrilton School Dist. No. 32 v. United States, 606 F.2d 222, 228 (8th Cir.1979) (en banc), cert. denied, 444 U.S. 1071, 100 S.Ct. 1015, 62 L.Ed.2d 753 (1980), this court unanimously rejected a district court's similarly limited interpretation of Milliken. Although the lead opinion states that Morrilton was intended to be limited to cases involving gerrymandered school district lines, so narrow a view of the acts that may constitute constitutional violations and trigger interdistrict relief is unsupportable. In Morrilton, this court found that school districts which were not themselves found to be constitutional violators nevertheless could be included in interdistrict relief where the effects of the unconstitutional actions of another (in Morrilton, the state) were felt in those school districts. Morrilton, 606 F.2d at 228. Similarly, the holding in United States v. Board of School Comm'rs., 573 F.2d 400, 410 (7th Cir.), cert. denied sub nom., 439 U.S. 824, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978) (cited in Morrilton, 606 F.2d at 228-29) affirms the appropriateness of granting interdistrict relief even absent separate constitutional violations by each school district, but nowhere limits relief only to cases where the school district is found to be dependent on the state and its boundaries established for segregative purposes. The lead opinion distorts what our earlier opinions have held in this regard.[6]
 
 
 196
 Again, in Liddell v. State of Mo., 731 F.2d 1294 (8th Cir.) (en banc) (Liddell VII ), cert. denied, 469 U.S. 816, 105 S.Ct. 82, 83 L.Ed.2d 30 (1984), we noted that in Liddell v. Board of Educ., 667 F.2d 643 (8th Cir.1981) (Liddell III )
 
 
 197
 we rejected the State's argument that the district court was without authority to formulate an interdistrict plan without finding an interdistrict violation. We also noted that voluntary interdistrict pupil exchanges "must be viewed as a valid part of the attempt to fashion a workable remedy within the City." [Liddell III, 667 F.2d] at 651. In an order appended to that opinion, we noted that the State had been "judicially determined to be a primary constitutional violator," and we held that an interdistrict transfer plan would be salutary and would be entirely enforceable against the State. Id. at 659.
 
 
 198
 Liddell VII, 731 F.2d at 1303. See Little Rock School Dist. v. Pulaski County Special School Dist. No 1, 778 F.2d 404 (8th Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 2926, 91 L.Ed.2d 554 (1986). Though gerrymandering is certainly one type of constitutional violation, nothing in the lead opinion explains why it is the exclusive means by which a school district may suffer significant segregative effects for which interdistrict relief may be granted.[7] See Evans v. Buchanan, 416 F.Supp. 328, 340 (D.Del.1976), aff'd, 555 F.2d 373 (3d Cir.1977) (Milliken's "specification of the deliberate drawing of lines to achieve segregation was by way of example, not limitation").
 
 
 199
 The lead opinion's heavy reliance on Lee v. Lee County Bd. of Educ., 639 F.2d 1243 (5th Cir.1981), and Goldsboro City Bd. of Educ. v. Wayne County Bd. of Educ., 745 F.2d 324 (4th Cir.1984), is also misplaced. Goldsboro is distinguishable on several grounds. The Goldsboro city school district had been declared unitary by a federal district court in 1973. See id. at 325-26. Moreover, in Goldsboro, there was no showing of any housing violations or interdistrict transfers for segregated purposes, and on appeal the Fourth Circuit specifically found that the district court did not erroneously apply the law to that case's facts. See id. at 328. Although Lee exhibits some similarities to the present case, as we noted in Little Rock the Lee case did not involve segregative interdistrict transfers, segregative boundary changes, or state-imposed residential segregation, and the city district had been previously declared unitary. See Little Rock, 778 F.2d at 429.
 
 Missouri's History of De Jure Segregation
 
 200
 Significantly, the lead opinion omits any discussion of the State of Missouri's long history of de jure segregation in which the KCMSD and most, if not all, of the SSDs participated. Much of this history, which was recounted in Liddell v. Board of Educ., 731 F.2d 1294 (8th Cir.1984) (Liddell VII ), is detailed in the district court's opinion granting intradistrict relief. See Jenkins v. State of Mo., 593 F.Supp. 1485, 1490-95 (W.D.Mo.1984). This history bears repeating here, however, because the nature and gravity of the constitutional violations for which plaintiffs seek redress can properly be evaluated only in light of their historical context.
 
 
 201
 The State of Missouri's implementation and enforcement of school segregation can be traced to well before the Civil War, when Missouri enacted laws prohibiting the creation of schools to teach blacks to read or write. Act of February 16, 1847, Sec. 1, 1847 Mo.Laws 103. Beginning in 1865, the Missouri constitution expressly required separate schools for blacks and whites. Mo. Const. 1865, art. IX, Sec. 2. This provision was retained in three successive constitutions. Mo. Const. 1875, art. XI, Sec. 3, retained Mo. Const. 1919, art. XI, Sec. 3, revised and retained, Mo. Const. 1945, art. IX, Secs. 1(a) and 3(c). See also Act of February 17, 1865, Sec. 13, 1865 Mo.Laws 170. In 1889, the Missouri legislature made it a criminal offense for a black child to attend a white school. Act of June 11, 1889, Sec. 7051(a), 1889 Mo.Laws 226. Although a 1954 Attorney General opinion declared the school segregation laws unenforceable, the statutes implementing the constitutionally mandated segregation were not repealed until 1957, see Act of July 6, 1957, Sec. 1, 1957 Mo.Laws 452, and the constitutional provision was not rescinded until 1976. See Adams v. United States, 620 F.2d 1277, 1280 (8th Cir.), cert. denied, 449 U.S. 826, 101 S.Ct. 88, 66 L.Ed.2d 29 (1980).
 
 
 202
 Prior to 1954, school districts in Missouri were not even in compliance with the "separate but equal" doctrine of Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896). From 1866 to 1929, state law exempted school districts from providing schools for black children if there were fewer than fifteen black children in the district and required them to discontinue black schools whenever average daily attendance fell below eight students. See 1865 Mo.Laws 177; 1869 Mo.Laws 86-87; 1870 Mo.Laws 149; 1887 Mo.Laws 264; 1893 Mo.Laws 247; 1909 Mo.Laws 790-91. In 1929, the Missouri legislature gave school districts the option to forgo schools for blacks altogether, no matter how many black school children resided in the district. 1929 Mo.Laws 382. Although school districts refusing to provide schools for blacks within their district were required to make interdistrict arrangements for and pay the tuition of black elementary school children beginning in 1929 and for black high school students beginning in 1931, the school districts were not required to fully reimburse transferred black students for transportation costs until 1945. See 1945 Mo.Laws 1700.
 
 
 203
 Rather than providing schools for blacks within their districts, school districts in the Kansas City metropolitan area, including the predecessor districts of the SSDs,[8] took full advantage of state law provisions allowing them to arrange for the transfer of black school children out of their districts. Blue Springs, Fort Osage, Center, Raytown, Grandview, and Hickman Mills provided no schools for blacks.[9] Lee's Summit did not operate any black schools after 1910. North Kansas City intermittently operated a black elementary school until 1944. Independence, Liberty, and Park Hill each operated a black elementary school. Independence operated a black high school from approximately 1934 to 1945, and Liberty offered high school through the eleventh grade after 1938. However, the evidence is overwhelming that the quality of education available in these black schools was quite poor, especially in comparison to that available in the white schools in the SSDs and the black schools in KCMSD. Moreover, despite state laws requiring districts not operating black schools to reimburse black students for tuition and at least part of their transportation costs, none of the SSDs did so until Lee's Summit began reimbursement in 1931, followed by Independence in 1945, Park Hill and North Kansas City in the late 1940s, and Liberty in 1953. As the district court itself found, in 1954 KCMSD was the only school district in the Kansas City metropolitan area providing any real educational opportunities for blacks, operating fourteen black elementary schools, one black junior high vocational school and one black high school-junior college. See Jenkins, 593 F.Supp. at 1492.
 
 
 204
 Legalized segregation of and discrimination against blacks in Missouri was not limited to education. State law permitted local authorities to establish separate libraries, parks, and playgrounds for whites and blacks, Mo.Rev.Stat. Sec. 165.377 (1959); made it a crime for a black to marry a white, Mo.Rev.Stat. Sec. 563.240 (1959); and required segregation in colonies for the "feebleminded." See, e.g., Jenkins, 593 F.Supp. at 1503. Of foremost importance to this case is the pervasive system of housing segregation in which all levels of government participated. Racially restrictive covenants, FHA appraisal practices, relocation policies of state and local housing agencies, and private discrimination operated to restrict blacks to certain geographic sections of the Kansas City metropolitan area.
 
 Housing Violations and HUD Liability
 
 205
 Judge Arnold's opinion recounts the long history of Missouri's involvement with housing discrimination in the Kansas City area, which in some instances continued through the 1970s. I join Judge Arnold in concluding that remand is required for further findings, for the purposes of fashioning interdistrict relief, on the extent of constitutional violations by the state and its various agencies in implementing segregative housing policies. For similar reasons, I would also reverse and remand for further consideration the district court's dismissal of HUD. Though the lead opinion affirms the district court's finding that HUD did not act arbitrarily or capriciously and that HUD's acts were without discriminatory intent or effect, the record makes clear that HUD committed numerous constitutional violations. As Judge Arnold points out:
 
 
 206
 With regard to HUD, the District Court found that the agency had acted "reasonably" because it had taken action in the 1970s to end discriminatory practices by HAKC, whose programs HUD funded. 593 F.Supp. 1498-99. Yet there was extensive evidence, not addressed by the District Court, that HUD knew of shortcomings in HAKC's tenant-assignment practices for years without taking action to end them.
 
 
 207
 Ante at 692 n. 10. Use of the arbitrary and capricious standard is inappropriate in the context of HUD's alleged constitutional violations through the participation in and support of racially segregated housing practices. Where a government entity's discriminatory practices causes housing and population shifts with metropolitan-wide effects, an interdistrict remedy has been found an appropriate form of relief. United States v. Board of School Comm'rs., 637 F.2d 1101, 1114 (7th Cir.), cert. denied, 449 U.S. 838, 101 S.Ct. 114, 66 L.Ed.2d 45 (1980). Moreover, considering whether the participation of each SSD in the dual school system had any significant interdistrict effect, the district court concluded that for each SSD the proof of any current effects was "weak, speculative and in any event de minimus [sic]." Jenkins, June 5 opinion at 12. Because the district court erroneously assumed that each SSD must be found to have committed a constitutional violation with current segregative effects before it could be included in interdistrict relief, the district court did not properly take into account the current segregative effects on the SSDs of the state's or KCMSD's actions to maintain a dual school system in the Kansas City metropolitan area.
 
 
 208
 Milliken makes clear that an interdistrict remedy is justified if the constitutional violations of even "a single school district have been a substantial cause of interdistrict segregation." Milliken, 418 U.S. at 745, 94 S.Ct. at 3127. The Supreme Court denied interdistrict relief in Milliken simply because the plaintiffs had only shown that the constitutional violations of the Detroit public school system had intradistrict, not interdistrict, effects. Id. at 747, 94 S.Ct. at 3128 (explaining that dissent's position was that the existence of a dual school system in Detroit justified an interdistrict remedy); id. at 749, 94 S.Ct. at 3129 ("Where the schools of only one district have been affected, there is no constitutional power in the courts to decree relief balancing the racial composition of that district's schools with those of surrounding districts."); id. at 751, 94 S.Ct. at 3130 ("Thus, there was no evidence suggesting that the State's activities * * * within Detroit affected the racial composition of the school population outside Detroit or, conversely, that the State's * * * activities within the outlying districts affected the racial composition of the schools within Detroit."). In contrast, the plaintiffs here presented evidence showing that KCMSD's decision to operate some completely black schools and some completely white schools long after 1954 led to the rapid turnover of neighborhoods from black to white and caused many whites to move out of KCMSD to the SSDs. The district court repeatedly recognized that evidence at trial demonstrated the link between KCMSD's delay in implementing effective integration policies during the 1960s and 1970s and the exodus of whites from KCMSD during this period in discussing KCMSD's liability for segregation within KCMSD. See Jenkins, 593 F.Supp. at 1492-95. The district court did not consider KCMSD's conduct as a basis for ordering interdistrict relief, however, because it misconstrued Milliken to require culpability with continuing segregative effects on the part of each SSD before that SSD could be included in an interdistrict remedy. Because under Milliken the conduct of even a single school district may be the basis for interdistrict relief if the continuing effects of that conduct are interdistrict, I would require the district court to consider on remand the extent to which KCMSD's delay in implementing an effective integration policy has current interdistrict effects.
 
 
 209
 Ironically, though Judge Arnold concludes that the district court misapplied Milliken in assessing interdistrict effects from housing violations, he apparently upholds as not clearly erroneous the district court's findings of no constitutional violations by the SSDs and its findings of only de minimis continuing segregative effects on the SSDs from the state's and the KCMSD's operation of a dual school system. To this extent, I part company with Judge Arnold.[10] These findings are inseparable from the district court's misunderstanding of the Milliken standard.
 
 Constitutional Violations by the SSDs
 
 210
 The district court failed to analyze the housing violations by the state agencies because it believed they were irrelevant to the SSDs' participation in any interdistrict relief. Similarly, the district court failed to analyze the effect of the state's and the KCMSD's discriminatory practices because it decided their conduct was irrelevant to any remedial relief. The record is replete with evidence of constitutional violations by many of the SSDs and of the effect those violations had on all of the SSDs and on the KCMSD. As has already been stated here, these violations cannot be ignored by simply expressing deference to the district court's findings under the clearly erroneous rule. Whether there exists a constitutional violation is more a question of law than of fact and is clearly subject to de novo appellate review. See, e.g., Bose Corp., 466 U.S. at 501 n. 17, 104 S.Ct. at 1960 n. 17 ("A finding of fact in some cases is inseparable from the principles through which it was deduced.").
 
 
 211
 Even under the district court's erroneous interpretation of Milliken, the lead opinion errs in affirming the district court's dismissal of the SSDs because it failed to find that the SSDs committed constitutional violations with cross-district effects. The uncontroverted evidence at trial showed that under the pre-1954 dual school system the SSDs exercised their discretion, granted them by the state, either to provide schools for black students which offered at best a substandard education or to decline to provide any schools at all. Instead, the SSDs transferred black students to the KCMSD. Understandably and undisputedly, KCMSD became the only school district in the Kansas City metropolitan area in which black school children could receive a complete education. Not only did the SSDs thus create segregated conditions in their individual districts by emptying their districts of all black school children, but they set historical precedent for interdistrict transfer of students on the basis of race in the Kansas City metropolitan area.
 
 
 212
 The district court's conclusion that the SSDs were local automonous units[11] and therefore exempt from liability for any segregative acts done by the state is the major premise on which the lead opinion relies in affirming the district court's finding that the SSDs committed no acts with discriminatory intent that had significant segregative effects. However, to the extent the SSDs exhibited autonomy in deciding to provide inferior or no schools for blacks, under Milliken proof of autonomy here leads only to the conclusion that the SSDs did commit constitutional violations. Moreover, the lead opinion ignores the uncontradicted fact that after the SSDs participated in pre-1954 segregation on an interdistrict level, they took no affirmative steps on a similar interdistrict level to reverse the effects of those autonomously chosen educational practices. Even if Milliken required proof of constitutional violations by each individual SSD, which it does not, the district court erred in failing to draw the obvious inferences from the uncontroverted evidence to find such violations in the "autonomous" acts of the SSDs. The result today, as the evidence at trial showed, is that KCMSD's student body is sixty-eight percent black whereas the student population of the SSDs is only five percent black.[12]
 
 
 213
 Continuing Significant Interdistrict Effects
 
 
 214
 My most fundamental objection to the majority's position, however, is its wholesale affirmance of the district court's finding that to the extent any constitutional violations were committed by any of the defendants, the continuing segregative effects on the SSDs were de minimis and that inclusion of the SSDs in an interdistrict remedy was therefore precluded.
 
 
 215
 In concluding that the pre-1954 dual school system in which the SSDs participated has no continuing interdistrict effects, the district court found that despite the fact that only KCMSD provided blacks in the Kansas City metropolitan area with any real educational opportunities prior to 1954 as a direct result of the constitutional violations of the state, the KCMSD and the SSDs, those violations had but a de minimis effect on the housing choices of blacks prior to 1954. Such a finding is contrary to legal precedent, many of the district court's own factual findings, and the plaintiffs' unrebutted expert and lay witness testimony and is clearly erroneous.
 
 
 216
 In affirming as not clearly erroneous the district court's findings of de minimis continuing segregative effects on the SSDs from the KCMSD's actions, the lead opinion follows the district court in overlooking the weight of uncontradicted evidence in the record and the district court's own findings that the KCMSD's perpetuation of segregated schools within the KCMSD caused a mass concentration of blacks in an area where a substantial number of whites lived. This in turn resulted in displacement of whites, who moved to or transferred into the SSDs.
 
 
 217
 The evidence produced at trial demonstrated that by a variety of affirmative official acts, the KCMSD sought to preserve the all-white character of some of its schools at the expense of the schools in the southeast corridor of Kansas City. There, KCMSD followed a policy of "integration and stabilization." As part of this piecemeal desegregation policy, KCMSD implemented attendance zones, intact busing, liberal transfers, neighborhood school policies, and faculty transfers which had segregative instead of integrative effects. One of the most significant of these was the creation of shifting and optional attendance zones. Evidence at trial indicated that the attendance zone choices were based on Troost, a north/south street that traditionally had divided white neighborhoods west of Troost from the neighborhoods to the east which also contained many whites but in which most of the blacks in Kansas City lived. Testimony at trial indicated that despite overcrowding in schools east of Troost and underuse of schools west of Troost, attendance zones did not traverse Troost until 1976. Moreover, testimony at trial established and the district court itself found that as the population of Kansas City changed in the years following Brown v. Board of Educ., 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), KCMSD "made frequent shifts in the attendance areas of its schools" with the result of removing white sections from the western-most portions of the racially transitional areas and attaching them to all-white zones further west, shifts which, coupled with a liberal transfer policy, "allowed attendance patterns to continue on a segregated basis." Jenkins, 593 F.Supp. at 1494. The district court also found that "as the black population expanded from the central city in a southeast direction, neighborhoods and schools experienced a racial transition. As blacks moved, or were bused to the schools in the [southeast] area, whites moved out." Id.[13] (citations omitted).
 
 
 218
 As a result of these policies, blacks were bused to or moved to the southeast area of Kansas City and whites moved to the neighboring SSDs. As the black population of Kansas City expanded to the southeast, KCMSD chose to operate some completely segregated schools and some integrated ones. The result of KCMSD's official school policies was to make the KCMSD "blacker" and the SSDs "whiter," actions which have been found by courts before to be constitutional violations for which interdistrict relief is appropriate. Cf. Hoots v. Pennsylvania, 672 F.2d 1107, 1121 (3d Cir.), cert. denied, 459 U.S. 824, 103 S.Ct. 55, 75 L.Ed.2d 60 (1982) (quoting Penick v. Columbus Bd. of Educ., 429 F.Supp. 229, 266 (S.D.Ohio 1977), aff'd, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979)) ("Actions and omissions by public officials which tend to make black schools blacker necessarily have the reciprocal effect of making white schools whiter.") (citation omitted). See Evans v. Buchanan, 393 F.Supp. 428, 436 and n. 15 (D.Del.1975) (presence of proportionately more black children in a city school than in the neighborhood served by the school likely encouraged white families to move to nearby suburbs, where "black students were barely present" in the school systems).
 
 
 219
 It is evident that the segregative policies perpetuated by KCMSD caused a greater concentration of blacks and black schools in the southeast corridor, directly resulting in displacing whites into the SSDs.[14] In this regard, the district court's own findings are at least contradictory and at most support the grant of interdistrict relief based on continuing effects in the SSDs from the KCMSD's policies. The district court recognized that the KCMSD had chosen to operate some completely segregated schools and some integrated ones in the district and that as of 1977, twenty-five one-race schools under the pre-1954 dual system remained ninety percent or more of the same race. See Jenkins, 593 F.Supp. at 1492. Moreover, in a supplemental order, of which we take judicial notice, that enjoined for one year the property tax rollback provided under a Missouri statute, the district court summarized its findings in this case to date by stating:
 
 
 220
 The Court has found that segregated schools, a constitutional violation, has led to white flight from the KCMSD to suburban districts, large number of students leaving the schools of Kansas City and attending private schools and that it has caused a system wide reduction in student achievement in the schools of KCMSD. It has also found that by improving the quality of education in the KCMSD, it will enhance the appeal of the school system, thus giving it a chance to retain its present white enrollment and also encourage whites in private and suburban schools to enroll in its schools. As set forth in its order of June 14, 1985, the basic remedial principle in school desegregation cases, is that "the scope of the remedy is determined by the nature and extent of the constitutional violation." Milliken v. Bradley, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974).
 
 
 221
 Jenkins v. State of Mo., No. 77-0420-CV-W-4, slip. op. at 1-2 (W.D.Mo. August 25, 1986). Not only does this language further support the view that the district court did recognize that the effects on the SSDs from the segregative policies of the KCMSD were more than de minimis, but it illustrates that the district court's refusal to grant interdistrict relief was clearly erroneous and contradictory to its own findings from the record.[15]
 
 
 222
 That the availability of schools influences housing choices is a common sense proposition. After a fifty-year period during which the SSDs provided no schools or inadequate schools for blacks, it is hardly surprising that black families living in the SSDs and those moving to the Kansas City area from other states chose to move to the KCMSD, where adequate educational facilities were available. As the district court notes in its opinion on intradistrict liability, the nexus between availability of schools and housing patterns has been recognized by the Supreme Court. See Jenkins, 593 F.Supp. at 1491 (quoting Swann, 402 U.S. at 20-21, 91 S.Ct. at 1278-79). This nexus has also been recognized by this court in the context of interdistrict cases. See, e.g., Little Rock, 778 F.2d at 412 n. 5. The Little Rock case is particularly instructive in that, under facts very similar to this case, we upheld a district court finding that black families from other school districts were drawn to the Little Rock school district precisely because it was the only district that provided blacks in the area with substantial educational opportunities. Id. at 412. The district court's finding in Little Rock that school availability influences housing on an interdistrict as well as an intradistrict basis, which we upheld, seriously undermines the credibility of the district court's finding in this case "that the absence of black schools in any of the [SSDs] did not discourage black families outside (or from within) Missouri from moving to and living in those districts." Jenkins, June 5 opinion at 18 (citations omitted).
 
 
 223
 The district court's finding is further undermined by several statements in its September, 1984 opinion regarding intradistrict liability of the state and KCMSD. In rejecting the state's argument that job availability rather than school availability was responsible for the segregated housing and school patterns within the KCMSD, the district court stated that "[o]ften jobs would pull migrants to the city and then availability of schools would influence, more specifically, what housing choice would be made within the city." Jenkins, 593 F.Supp. at 1490. In finding that the current dual housing market affected blacks in the KCMSD, the court again referred to the "inextricable connection" between schools and housing. Jenkins, 593 F.Supp. at 1491. It is difficult to see how school availability would be an important factor in making housing choices within a single school district, but would not influence housing decisions within the metropolitan area in general.
 
 
 224
 In support of their argument that the constitutional violations here produced significant interdistrict effects, plaintiffs produced statistics showing that although the school population in the three-county area, excluding KCMSD, was between 7.19% and 8.7% black in 1881, the black school-aged population in the same area had steadily declined to between .39% and 1.5% by 1954. At the same time, the black population in KCMSD had risen from 8.8% in 1900 to 14.0% in 1954. Plaintiffs produced several expert witnesses on education and housing patterns who testified that the inability of blacks to provide their children with an education in the SSDs caused many black families to move to KCMSD, the only district providing any real educational opportunities for blacks in the Kansas City metropolitan area. The absence of schools for blacks in the SSDs, the experts testified, also influenced the housing choices of blacks moving into the Kansas City metropolitan area from other states, both because there would be less chain migration to the SSDs as the existing black population in the SSDs declined and because accessible education is an important factor for blacks, as for all people, in making housing choices. Plaintiffs also produced the testimony of many blacks who had lived in the SSDs prior to 1954 but had had to travel long distances or move to KCMSD itself to receive an education. Other evidence included pre-1954 school board reports and other documents stating that the absence of educational opportunities for blacks in rural areas caused by the dual school system was causing many black families to leave rural areas for large cities.[16]
 
 
 225
 Notwithstanding plaintiffs' extensive evidence, the district court concluded that the absence of educational opportunity for blacks in the SSDs prior to 1954 had a de minimis effect on current housing patterns and school segregation in the Kansas City metropolitan area. The lead opinion merely reasserts the district court's findings and concludes that they are not clearly erroneous. Close examination of the district court's opinion, however, reveals that its reasons for rejecting the plaintiffs' evidence as de minimis ring hollow. For example, the district court found that the increase in the black population in KCMSD prior to 1954 was attributable to jobs and employment opportunities available in the KCMSD area, rather than to the availability of schools. Jenkins, June 5 opinion at 15-16 and 18. No one disputes that economic opportunity was a major factor in drawing blacks, especially from the South, to the Kansas City metropolitan area. The plaintiffs' argument, however, was not that school availability to the exclusion of economic opportunity drew blacks to KCMSD. Rather, plaintiffs argued that once blacks were drawn to the Kansas City area for whatever factors, including economics, school availability caused many blacks to settle in KCMSD rather than in the SSDs. This argument remains unrefuted, and in fact is substantiated by the district court's own findings regarding the nexus between school availability and housing patterns.[17] See Jenkins, 593 F.Supp. at 1491.
 
 
 226
 The district court also failed to assess the importance of the relative depopulation of blacks from the SSDs prior to 1954 with respect to the present racial composition of the Kansas City area. In rejecting the plaintiffs' evidence of depopulation, the district court noted that although the black population in the three-county area, excluding KCMSD, decreased by only approximately 837 from 1910 to 1960, the black population in KCMSD increased by more than 45,000 during this same period. Thus, the district court concluded, the impact of that movement on the black enumeration in KCMSD was insignificant. Jenkins, June 5 opinion at 15-16. The effect of the decline of the black population living in the SSDs prior to 1954, however, is not limited to those black families that left the SSDs for KCMSD because of the lack of schools. Instead, as the plaintiffs' evidence demonstrated, the resulting lack of blacks in the SSDs in turn caused blacks moving to the Kansas City area from the South to live in the KCMSD, where there was a growing black population, rather than in the overwhelmingly white and hostile SSDs.
 
 
 227
 Not only did the district court improperly discredit the plaintiffs' evidence, it also omitted any reference to the evidence that most strongly supported plaintiffs' claims. For example, the plaintiffs submitted several reports prepared by the superintendent of public schools in Missouri during the 1920s and 1930s stating that the absence of black schools in rural areas was causing black families to migrate to the large cities.[18] Contemporaneous documents such as these, prepared by school officials at the time black depopulation of rural areas was occurring in Missouri, are highly probative of the link between school availability and housing patterns on an interdistrict basis. Although the district court recognized this link, see Jenkins, 593 F.Supp. at 1490 ("[u]ndeniably, some blacks moved to districts, including the KCMSD, that provided black schools"), it largely discounted the plain inferences to be drawn from it.
 
 
 228
 The district court rejected the plaintiffs' statistical evidence regarding the number of black students in the SSDs who transfered to KCMSD prior to 1954 as "de minimis." It is true that the number of transfers actually shown to have occurred during this period, anywhere from 251 to 600, appears small. These examples, however, were presented only as representative of the effects of the dual school system on school attendance and housing patterns in the Kansas City area, not as an exhaustive enumeration. The plaintiffs' inability to produce more accurate statistical evidence of interdistrict transfers is not surprising in light of the incentives to underreport black students and the conceded unavailability of interdistrict transfer records, for which the SSDs are at least partially responsible. The SSDs had an incentive to underreport the number of black school children in their districts because state law excused them from their duty to provide a school for blacks if the number of black school children in the district fell below a certain number. Black students from the SSDs had an incentive to be counted as residents of the KCMSD rather than as residents of the SSDs because they could thereby avoid paying tuition to attend KCMSD before the SSDs began to reimburse them for tuition in the 1930s and 1940s. It is difficult to imagine what level of statistical proof would satisfy the district court and the lead opinion. Evidently, they would be satisfied only if the plaintiffs had paraded before the district court every black student who had transfered from the SSDs to KCMSD or who had moved from the SSDs to KCMSD prior to 1954. Such a stringent level of proof has never been required. See, e.g., Board of School Comm'rs., 637 F.2d at 1113-14.
 
 
 229
 Even assuming the numbers relied upon by the district court are accurate and controlling, it requires little additional evidence to buttress the common sense proposition that blacks would be deterred from migrating to an overwhelmingly white school district where no black schools existed, where arbitrary policies or school transfers placed the primary burden of educational expenses on many black families, and where racial covenants prevented home purchases. To fail to acknowledge that blacks were deterred from living in the SSDs is to ignore the obvious. Cf. International Brotherhood of Teamsters v. United States, 431 U.S. 324, 367, 97 S.Ct. 1843, 1870-71, 52 L.Ed.2d 396 (1977) (in reversing denial of Title VII relief, the Supreme Court stated that to fail to account for non-applicants being deterred from even applying for employment would mean that "[v]ictims of gross and pervasive discrimination could be denied relief precisely because the unlawful practices had been so successful"). Perhaps most disturbing, however, is the district court's repeated reliance on the increasing black enrollment in the SSDs after 1954 as an indication that the prior constitutional violations of the SSDs have no current interdistrict segregative effects. The district court noted, for example, that black enrollment in Hickman Mills increased from twenty-nine black students in 1967 to 1,571 in 1983, and that black enrollment in Park Hill has increased by 110 students since 1976. Jenkins, June 5 opinion at 56, 88. That black enrollment in the SSDs has increased since the 1960s may indicate that barriers to black movement into the SSDs are declining over time. Far from indicating that there are no current significant segregative effects of the SSDs' past conduct, however, this increase in black enrollment in the SSDs since Brown v. Board of Educ. is conclusive evidence that the lack of schools for blacks in the SSDs prior to 1954 was a deterrent to blacks settling there. In light of the compelling evidence presented by the plaintiffs that the absence of schools for blacks in the SSDs prior to 1954 had a significant effect on housing choices made by blacks during this time, the district court's conclusion that the effects were de minimis is clearly not supported by the record.
 
 
 230
 Affirmative Duty of State of Missouri, KCMSD, and the SSDs
 
 
 231
 It is clear that the SSDs, as well as the State of Missouri and KCMSD, have all failed to fulfill their affirmative duty under Brown v. Board of Educ. to eliminate the vestiges of their prior segregative policies and that significant interdistrict effects of these policies are still evident in the Kansas City metropolitan area. The district court, now affirmed by this court, held that because all of the SSDs had opened the doors of their all-white schools to blacks in 1960, the SSDs had discharged their duty under Brown. Courts have long recognized, however, that racially neutral policies are generally ineffective to counteract the continuing effects of past segregative practices, especially where such segregation has influenced housing patterns. See, e.g., Swann, 402 U.S. at 20-21, 91 S.Ct. at 1278-79; Kemp v. Beasley, 389 F.2d 178, 190 (8th Cir.1968). The district court itself recognized the ineffectiveness of racially neutral policies after a long period of intentionally segregative policies in its opinion on intradistrict liability. See Jenkins, 593 F.Supp. at 1490-95. The reason such racially-neutral plans are ineffective is plain. A racially neutral policy, such as a neighborhood school policy, will simply not correct the effects of many years during which black schools were located in only certain parts of a school district, causing black families to settle in those areas. Similarly, to merely open to blacks the doors of schools in virtually all-white districts simply fails to eradicate the effects of many years when those districts provided blacks with no schools or at best inadequate schools, causing black families already living in those districts to leave and discouraging black families newly moving into the area from settling in those districts. It is precisely because of this continuing affirmative duty under Brown that pre-1954 evidence is relevant.
 
 Conclusion
 
 232
 The effects of the SSDs' pre-1954 constitutional violations and their continuing failure to fulfill their duty under Brown are still evident in the Kansas City metropolitan area today. Eighty-seven percent of the black students in the Kansas City metropolitan area are educated in KCMSD; eighty-nine percent of the white students attend school in one of the SSDs. Yet the district court concluded that the pre-1954 conduct of segregated schools and housing practiced by the SSDs did not significantly contribute to the current racial imbalance in the Kansas City metropolitan area. To support this conclusion, the district court noted that KCMSD was only 18.9 percent black in 1954-55. The fact that the major increase in the black population in KCMSD occurred after 1954, said the district court, is strong evidence that the current racial composition of the Kansas City area was caused by factors other than the pre-1954 dual school system. See, e.g., Jenkins, June 5 opinion at 41-42. Undeniably, many factors have contributed to the enormously disparate racial composition of the student bodies of KCMSD and the SSDs. Housing policies of federal, state, and local agencies have contributed to the dual housing market that exists in the Kansas City metropolitan area, which in turn has contributed to the de facto dual school system that exists today. Ineffective integration policies of KCMSD during the 1960s and 1970s caused an exodus of whites from KCMSD to the SSDs.[19] The evidence at trial showed that the continuing influx of blacks to the Kansas City metropolitan area from the South and the higher birthrate among blacks have also contributed to the higher percentage of blacks in KCMSD. To the extent that these factors have magnified the effects on the SSDs of the pre-1954 conduct of state, the KCMSD, and the SSDs and those effects have not been affirmatively addressed, all the defendants are at least partially to blame. Had the SSDs not contributed to the depopulation of blacks from those areas by failing to provide schools for blacks, the higher birthrate among blacks would have presumably also increased the percentage of blacks living in the SSDS. Similarly, had the SSDs' policies not contributed to the depopulation of blacks from those areas, more blacks moving into the Kansas City metropolitan area from the South would have settled in the SSDs rather than in KCMSD.
 
 
 233
 The lead opinion agrees with the state and the SSDs, who emphasize that the plaintiffs' case rests entirely on racial disparities, that proof of disparate impact on the SSDs is not enough to hold the SSDs liable and provide the basis of interdistrict relief. See Columbus Bd. of Educ. v. Penick, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979). I have no quarrel with that premise. But as Penick recognizes, in Swann intradistrict relief was premised on a presumption of continuing racial imbalance within a unitary district. See Penick, 443 U.S. at 479, 99 S.Ct. at 2978. Here the racial imbalance is clear evidence of continuing segregation following a pre-1954 de jure policy. It is not necessary to switch the burden of proof where there is overwhelming evidence of violations and effects throughout the system.
 
 
 234
 Moreover, the lead opinion is also incorrect in affirming the district court's reliance on the mere passage of time as exculpating the SSDs. The lapse of decades, without any showing of affirmative steps taken to reverse the invidious effects of de jure segregation, reinforces the broad scope of the effects of the defendants' constitutional violations here. Nor is the lead opinion correct in affirming the district court's rejection of the overall thrust of plaintiff's proof of interdistrict effects on the grounds that a series of de minimis violations cannot be aggregated to produce a finding of a constitutional violation. See, e.g., Dayton Bd. of Educ. v. Brinkman, 433 U.S. 406, 413, 97 S.Ct. 2766, 2772, 53 L.Ed.2d 851 (1977). Here, neither the violations found proved by the district court nor the effects of those violations are insignificant. See, e.g., Jenkins, 593 F.Supp. at 1503 (finding that presence of dual schools had important segregative effects throughout the Kansas City metropolitan area). The premises on which the majority bases its affirmance of the district court's conclusion of de minimis continuing segregative effects on the SSDs have no basis in law nor in the facts as otherwise found by the district court and as developed at trial.
 
 
 235
 Although the lead opinion suggests to the contrary, this case differs notably from Milliken and this circuit's Little Rock case in that it does not present on appeal an issue of whether the only appropriate remedy is consolidation of the entire metropolitan area's school districts.[20] The plaintiffs and the KCMSD seek alternative forms of interdistrict relief as well as consolidation as a means to achieve an integrated school system. And even if the requested relief includes consolidation, relief can be tailored by the district court itself or as directed by this court to fit the constitutional violations. As was true in the Little Rock case, the automony of the city and suburban school districts can be preserved concurrent with mandated interdistrict relief. As we stated in Liddell VII:
 
 
 236
 [R]elating the remedy to the violation pursuant to Milliken II [433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) ] does not require a finding that each educational program at issue has in the past been "infected with the discriminatory bias of a segregated school system." * * * It is sufficient to determine that the remedial program is directed to cure the general condition offending the Constitution.
 
 
 237
 Liddell VII, 731 F.2d at 1315-16 n. 18 (citation omitted). The relief sought here is narrowly tailored to the particular situation and responsive to the Supreme Court's concern in Milliken that the "nature of the violation determine[s] the scope of the remedy." Milliken, 418 U.S. at 738, 94 S.Ct. at 3124 (citation omitted).
 
 
 238
 The quarrel I have with the intradistrict relief mandated by the district court, as modified by the lead opinion, is that the intradistrict programs will do little to integrate the metropolitan school system. The lead opinion calls for improved facilities and quality education programs, requires the state to pay its share of the cost of those programs, and authorizes the district court to order a tax increase if that alternative is necessary to enable the school district to bear its share of the cost of the mandated programs. This remedy is fine as far as it goes; however, it falls far short of the relief that should be required under the facts of this case.[21] It is hoped that at the very least the magnet school component and the voluntary interdistrict transfer plan, if implemented, will be of some help in integrating the district. In my view, however, these interdistrict programs should have been mandated already.
 
 
 239
 To summarize, I would hold that the district court erred in interpreting Milliken v. Bradley, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974), to preclude interdistrict relief. Under Milliken, properly interpreted, the district court's own factual findings with regard to the constitutional violations of the state and KCMSD, especially with regard to the significant link between housing patterns and school availability in the Kansas City metropolitan area, strongly suggest that the plaintiffs are entitled to an interdistrict remedy. Because the district court clearly erred in finding that the SSDs committed no constitutional violations with continuing significant interdistrict effects, the district court's dismissal of the SSDs should be reversed and remanded for further proceedings. If on remand, after each of the SSDs have had an opportunity to present evidence, it remains unrebutted that the acts of the state, the KCMSD, or any of the SSDs have a continuing interdistrict effect, those SSDs which the district court determines to be within the violations' effects should be ordered to participate in an interdistrict remedy, such as a mandatory interdistrict transfer program, narrowly tailored to remedy the constitutional violations proved here.
 
 
 240
 The case should be reversed and remanded for reconsideration in light of Milliken v. Bradley, and the SSDs and HUD should be joined to determine the extent of their liability.
 
 
 
 *
 Judge Bowman did not participate in consideration of this case and Judge Magill was not a member of the court when it was argued and submitted
 
 
 [1]
 The Honorable Russell G. Clark, United States District Judge for the Western District of Missouri
 
 
 [2]
 The named student plaintiffs were replaced at various times during the litigation. In February 1985, the court certified the class of present and future KCMSD students
 
 
 [3]
 The named defendants included the State of Missouri, the Missouri State Board of Education and various Missouri officials, the State of Kansas, the Kansas State Board of Education and various Kansas officials, several Kansas school districts in the Kansas City metropolitan area, twelve Missouri school districts in the area, the United States Departments of Transportation (DOT), Health, Education, and Welfare (HEW), and Housing and Urban Development (HUD)
 
 
 [4]
 These rulings were certified under 28 U.S.C. Sec. 1292(b) for interlocutory review. 460 F.Supp. at 445. An appeal, taken by the KCMSD and the North Kansas City School District, was denied by this court. KCMSD thereafter filed an appeal under 28 U.S.C. Sec. 1291 which was dismissed. See School District of Kansas City, Missouri v. Missouri, 592 F.2d 493 (8th Cir.1979)
 
 
 [5]
 Before trial, the DOT and one of the SSDs, the Raymore-Peculiar School District, were dismissed voluntarily. See Order of June 5, 1984 at 2
 
 
 [6]
 The eleven districts dismissed were the Blue Springs, Center, Fort Osage, Grandview, Hickman Mills, Independence, Lee's Summit, Liberty, North Kansas City, Park Hill, and Raytown School Districts. HEW subsequently was dismissed for plaintiffs' failure to prove that the agency acted with racial animus or abused its discretion in the enforcement of Title VI. See Order of July 16, 1984
 
 
 [7]
 The court specifically found that Independence, Lee's Summit, Liberty, North Kansas City, and Park Hill had earlier maintained dual school systems, but the other districts had not. Id. at 43-95
 
 
 [8]
 H.B. 171 increased from 500,000 to 700,000 the size of a city that should constitute a single school district. In the 1960 census, the population of Kansas City did not exceed 500,000. The court found that significant annexations in eastern and southern Jackson and Clay Counties occurred after the bill was enacted and that KCMSD had annexed several all-white schools from 1955 to 1973
 
 
 [9]
 In 1982 the Center district had an enrollment of 10.6% black, Grandview 9.8%, Hickman Mills 16.7%, and Raytown 7.6%. Id. at 41-42
 
 
 [10]
 See Note 22, infra
 
 
 [11]
 While the court conceded that the State may have through its actions created an atmosphere in which private white individuals and members of the real estate, banking, and insurance communities could justify bias against blacks, it found no evidence that the State significantly encouraged such practices. 593 F.Supp. at 1501-03. The court also found that freeway placement did not amount to a constitutional violation
 
 
 [12]
 In Little Rock this court rejected the consolidation remedy but ordered adjustment of the boundaries between the districts, a voluntary intradistrict or interdistrict transfer system, the exploration of magnet or special school or programs, and consideration of cooperative programs. 778 F.2d at 435-36. In Liddell we approved a settlement providing for intradistrict relief, a voluntary transfer program between cities and suburban schools and a magnet school program
 
 
 [13]
 Chief Judge Lay's dissent, in contrasting facts to rhetoric "doth protest too much." W. Shakespeare, Hamlet, Act III, sc. ii, line 242. The language, on its first page particularly, is exaggerated, without support in the record. The "extravagant language" (see Milliken, Stewart, J., concurring, 418 U.S. 753, 94 S.Ct. 3112, requires this rejoinder
 
 
 [14]
 We need point to only a few examples. "The record is replete with evidence of constitutional violations by many of the SSDs and of the effect those violations had on all of the SSDs and on the KCMSD." Chief Judge Lay's dissent at 94. In discussing the rejection of the evidence of Dr. James D. Anderson, plaintiff's expert historian which the district court discussed in detail in the June 5, 1985 Order, id. at 15-16, 18, Chief Judge Lay states: "This evidence was highly probative and it was wholly arbitrary for the court to reject it and inject its own inferences. Moreover, I believe it is especially crucial in a case of this nature to give great consideration to the testimony of historial experts where the theory to be proved occurred long ago and few witnesses are alive to testify." Chief Judge Lay's dissent at 103, n. 17. The increase in black enrollment in the SSDs since Brown "is conclusive evidence that the lack of schools for blacks in the SSDs prior to 1954 was a deterrent to blacks settling there. * * * It is clear that the SSDs as well as the state and KCMSD, have all failed to fulfill their affirmative duty under Brown v. Board of Ed. to eliminate the vestiges of their prior segregative policies and that significant interdistrict effects of these policies are still evident in the Kansas City metropolitan area." Id. at 106. "Here the racial imbalance is clear evidence of continuing segregation following a pre-1954 de jure policy." Id. at 109
 
 
 [15]
 The district court pointed to evidence that the SSDs are governed by local boards elected by the voters, hire the superintendents and teachers, by vote establish their own tax levy, have plenary power to establish school attendance zones, and determine whether to provide transportation for their students. Reorganization is a decision to be made by the local school districts, and the state constitution prohibits legislative enactment of special laws to change the boundaries of any school district. The district court further found that there was no discriminatory intent in the establishment or maintenance of the boundary lines between the school districts. Order of June 5, 1984 at 10-11
 
 
 [16]
 The district court in its June 5, 1984 Order made the following findings: The evidence that segregated schools existing before 1954 were the direct and substantial cause of blacks leaving each SSD, and that such had a significant segregative effect in the KCMSD "was weak, speculative and in any event de minimis." See Order of June 5, 1984 at 12. Plaintiff's argument that the state through its agents, the SSDs, maintained a regional black interdistrict school system causing blacks to leave the SSDs and migrate to Kansas City in search of an education is not supported by the law or the evidence. Id. at 15. Assuming the entire population decrease in the three county area was caused by people leaving and going to Kansas City because of the dual school system, it found "the impact of that movement on the KCMSD enumeration insignificant." Id. at 16. The motivation for blacks leaving the three county area and moving to Kansas City "resulting from segregated schools was de minimis and insignificant" when compared with other primary motivating factors transferring blacks to the KCMSD under the segregated school system "is not a cause of the present racial distribution of the population in the three county area." Id. at 18. The Jenkins class did not persuade the court "that any vestiges or significant effects of the pre-1954 dual school system remain" in any of the SSDs. Id. at 18. "At most plaintiff's evidence is only de minimis and is therefore legally insufficient to justify the relief sought against the suburban school district defendants." Id. at 98. The district court summarized:
 Another factor negating the importance of plaintiffs' voluminous pre-1954 evidence is simply its age. Our society is dynamic; myriad factors produce a multitude of simultaneous decisions and consequent effects. If it were a stagnant entity, the pernicious effects of de jure segregation would be obvious. Due to its fluid nature, however, acts now 30 years past have negligible present effects. Such is the fate of the discriminatory practices plaintiffs took months to develop. Too many events have intervened, reshaping earlier actions. Lee v. Lee County, supra, 639 F.2d at 1259.
 Id. at 98-99. In concluding, the district court stated "even if the court were to view plaintiff's evidence liberally, which under Rule 41(b), it is not required to do, the violations proved are at most, de minimis and far removed in time." Id. at 105.
 Chief Judge Lay's dissent does not establish what the Jenkins class and KCMSD did not argue, that these findings of fact are clearly erroneous.
 
 
 [17]
 Chief Judge Lay's dissent also argues that a recent order of the district court made some nine months after the argument of this case illustrates that the refusal to grant interdistrict relief was clearly erroneous and contradictory to its own findings. We cannot read the general statement in the recent order to have the effect of setting aside carefully detailed findings of facts and conclusions in its 105 page June 5 Order, its 21 page order on intradistrict liability, or its 45 page order on remedy
 
 
 [18]
 See Note 16, supra
 
 
 [19]
 Milliken makes clear that "an interdistrict remedy might be in order * * * where district lines have been deliberately drawn on the basis of race." 606 F.2d at 228 (quoting Milliken, 418 U.S. at 745, 94 S.Ct. at 3127). Unlike the present case, Morrilton contains findings that clearly fall within the Milliken language. We dealt in Morrilton with the consolidation of school districts in Conway County, Arkansas that created an all-black East Side District and a disproportionately white Morrilton District. The court stated:
 The violation here is clearly interdistrict in nature. East Side is almost entirely black and includes territory that would properly have been absorbed by the surrounding districts were it not for racial considerations. The boundaries of the East Side District, and consequently, the boundaries of the other school districts in Conway County, were not neutrally drawn. Thus, the prohibition in other cases * * * is not applicable here. Interdistrict relief is appropriate and necessary to remedy the constitutional violation.
 Id. (citations omitted). The court continued:
 Here, the nature of the violation was the consolidation of school districts on the basis of race. * * * [T]he effects of that consolidation were manifested primarily in the boundaries and racial composition of the Morrilton, Plumerville and East Side Districts. East Side is almost all black, and Morrilton is disproportionately white.
 Id. at 229.
 Morrilton holds that the unconstitutional consolidation of school districts so as to create an all-black district leaving others disproportionately white may properly be remedied through interdistrict relief. To argue that Morrilton compels imposition of an interdistrict remedy on the innocent SSDs in this case ignores that it deals with racial gerrymandering.
 
 
 [20]
 The court also specifically found the converse. The district court found that no SSD had committed any constitutional violation that had interdistrict segregative effect in the KCMSD or any other district. Order of June 5, 1984 at 18-19, 45, 48, 51, 54, 59, 67, 74, 78, 83, 91, and 95
 
 
 [21]
 The court observed that people move for a variety of reasons, including a desire to be with persons of the same race or religion. It specifically found that many blacks who moved to the suburbs did so to enjoy a middle class environment rather than an integrated environment. Order of June 5, 1984 at 35. A substantial number of black families moved to the SSDs during and after the 1960s, many from inside the KCMSD. Id. at 41-42. There was testimony that crime and city riots were factors in housing choices
 
 
 [22]
 With respect to the various districts, the court found that Fort Osage had had no covenants, Order of June 5, 1984 at 51, that Grandview, Lee's Summit, and North Kansas City had very few covenants, id. at 53, 73, and 83, and that Independence and Liberty also had few such covenants. Id. at 66, 77. The district court found that the restrictive covenants had no effect in Blue Springs, id. at 44-45, and Park Hill, id. at 90. There was no evidence that covenants prevented blacks from moving into Independence, id. at 66, Lee's Summit, id. at 73, or Liberty, id. at 78, and there was no present effect of past practices in preventing movement into Center, id. at 48, Hickman Mills, id. at 59, and Raytown, id. at 94. There was no credible evidence of housing discrimination in North Kansas City that had substantial interdistrict effect and much of the development there occurred after the effects of the few covenants were mooted by Shelley, id. at 83, and similar development after Shelley eliminated the effect of such covenants in Grandview. Id. at 53
 
 
 [23]
 Both cases dealt not only with the housing issue, but also contained strong findings based upon boundary violations. See Part VI, infra
 
 
 [24]
 On similar facts in United States v. Yonkers Board of Education, 624 F.Supp. 1276 (S.D.N.Y.1985), decided after submission of this case, a New York district court imposed an interdistrict remedy based on housing violations. The detailed findings of the district court established a lengthy chain of actions which were designed to and succeeded in concentrating the black population in southwest Yonkers and in maintaining east and northwest Yonkers as overwhelmingly white communities. In contrast to the facts presented in this case, not one of Yonkers' subsidized housing projects for families was located in the overwhelmingly white neighborhoods of the city's east and northwest sections. Sites for such projects in white communities were repeatedly considered and rejected. Such action contributed significantly to extreme segregation in Yonkers. Id. at 1364-65. More than 30 years of subsidized housing activity with a sizeable and changing group of city officials sharing responsibility was involved. Id. at 1369. Over that period, there was constant strong community opposition following proposals of sites, a political structure likely to make community opposition effective, and extreme consistency in sites in east Yonkers and other heavily white areas being rejected. Whatever the personnel, there was a common theme that racially influenced opposition to subsidized housing in certain areas of the city and acquiescence in that opposition by city officials. Id. at 1369-70. The court found that the extreme concentration of subsidized housing in southwest Yonkers was the result of a pattern and practice of racial discrimination by city officials. Id. at 1373
 
 
 [25]
 Chief Judge Lay's dissent devotes considerable discussion to the findings of the district court in the intradistrict hearing concerning the acts of KCMSD. It refers to the movement of the black population from the central city in a southeast direction. See 593 F.Supp. at 1494. The dissent embarks upon factfindings of its own, however, when it argues that such movement "directly result[ed] in displacing whites into the SSDs." Chief Judge Lay's dissent at 98-99. This is directly contrary to the finding of the district court in its consideration of interdistrict liability, and the dissent makes no effort to consider these statements in a proper Rule 52(a) analysis
 
 
 [26]
 A recent article, Housing Discrimination as a Basis for Interdistrict School Desegregation Remedies, 93 Yale L.J. 340 (1983), flatly argues for the extension of housing as a basis for metropolitan school desegregation remedies and as a means of overcoming the Milliken barriers. It outlines in some detail the use of this theory in various desegregation cases, including this one. See id. at nn. 20 & 21. Its description of the limitations of this theory are of interest:
 By contrast, the housing approach is limited in two ways. It does not justify expansion of the remedy beyond the geographical area of operation of the housing authority or other governmental entity found guilty of constitutional violations. Further, the scope of the remedy is limited to the extent to which official housing discrimination demonstrably caused school segregation. Consequently, the housing approach is consistent with the agency principle that seeks to prevent local agents of the state from escaping participating in remedies for their own wrongdoing.
 Id. at 347 (emphasis added) (footnotes omitted). There simply is no evidence in the record in this case that official housing discrimination caused school segregation and the findings of the district court as we have outlined above so demonstrate.
 
 
 [27]
 Goldsboro commented about the myriad reasons for increase in black population in metropolitan areas, referring to Bradley v. School Board of the City of Richmond, Va., 462 F.2d 1058, 1066 (4th Cir.1972), aff'd without opinion by an equally divided court, 412 U.S. 92, 93 S.Ct. 1952, 36 L.Ed.2d 771 (1973). Goldsboro, 745 F.2d at 330 n. 9
 
 
 [28]
 Chief Judge Lay in his dissent argues that the SSDs did not satisfy the requirements of Brown by simply adopting a racially neutral position. The argument that the SSDs must do more to counteract the interdistrict effects flowing from the pre-1954 interdistrict violations completely and totally ignores the district court's findings that any pre-1954 acts had negligible and de minimis current effects
 
 
 [29]
 The Supreme Court, in Wygant v. Jackson Board of Education, --- U.S. ----, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986), pointed to the continued vitality of this principle
 
 
 [30]
 A voluntary interdistrict program is one that has great potential for improving the racial balance in the Kansas City area. The experience in St. Louis with such a plan seems to have been favorable. The district court is correct in its holding that such a program cannot be mandatorily imposed upon the record before the court. Whether a refusal of a district to participate in such a voluntary program may evidence discriminatory intent and thus be an independent basis for further relief and mandatory participation is an issue that we should not anticipate
 
 
 [31]
 That portion of the court's order relating to achieving AAA status divided costs evenly between the State and KCMSD. None of the parties object to this portion of the ordered remedy which provides for an increase in librarians and teachers primarily for the purpose of providing additional planning time
 
 
 [32]
 This program carried a total cost of $12,000,000 with payments of $2,000,000, $4,000,000, and $6,000,000 for each of three years
 
 
 [33]
 The valuation per pupil in KCMSD is $60,371 as opposed to averages of $40,000 in the SSDs. State Ex. 4
 
 
 [1]
 The lead opinion does not make clear its precise view of the District Court holding that because the SSDs are not themselves constitutional wrongdoers, they may not be made part of an interdistrict remedy for State housing violations. See ante at 671-74. At points, the opinion appears to agree that Milliken precludes inclusion of non-culpable SSDs in an interdistrict remedy for State violations. See ante at 672-74. At other points, however, the opinion suggests that the District Court viewed the lack of SSD culpability simply as an important factor in determining that interdistrict relief was inappropriate, a factor considered along with factual findings as to the lack of interdistrict effects of state-fostered housing discrimination. See ante at 671-73. This is a mischaracterization of the District Court's position which understates the significance the District Court attached to SSD innocence. The District Court repeatedly made clear its view that the fact that the SSDs were not constitutional violators, taken by itself, barred requiring SSD participation in an interdistrict remedy. See Opinion of June 5 at 6, 34-42, 45, 47-48, 51, 53-54, 58-59, 66-67, 73-74, 78, 82-83, 89-91, 94-95, 97, 100-103. Further, the District Court did not determine whether or what interdistrict segregation is attributable to State housing violations, and never claims to have made such a determination; instead, having concluded that SSD innocence precluded interdistrict relief, the District Court found it unnecessary to devote substantial consideration to the question of interdistrict effects. See infra, p. 690, Part II
 
 
 [2]
 The lead opinion's citation of Hills is particularly ironic because the author of Hills, Mr. Justice Stewart, expressly stated in his Milliken concurrence that state officials' housing violations, if they had an interdistrict effect, would justify an interdistrict remedy. See infra at 689, quoting Milliken, 418 U.S. at 755, 94 S.Ct. at 3132 (Stewart, J., concurring)
 
 
 [3]
 Indeed, the principal opinion concedes that a constitutional violation in the operation of the KCMSD with interdistrict segregative effects felt in the SSDs would merit an interdistrict remedy involving the SSDs. See, e.g., ante at 672. Yet it offers no explanation of how or why violations by the State or the KCMSD in operating KCMSD are to be distinguished from State housing violations. In either case the SSDs would themselves be innocent of wrongdoing, but would feel the effects of other actors' violations
 
 
 [4]
 Of course, since formulation of an appropriate interdistrict remedy is guided by equitable principles, the fact that a school district has not itself violated the Constitution may affect the particular role it is assigned in remedying the state's violation. See infra at 694-95
 
 
 [5]
 The lead opinion maintains that Morrilton is a gerrymandering case that "must be limited to its facts." Ante at 673-74. Yet, the lead opinion provides no explanation of why the principles we approved in Morrilton are to be so limited in their application. It does not explain how or why State discrimination in drawing school district boundaries is to be distinguished from State discrimination in housing. Housing violations may be harder to prove or create special problems of remedy, but that does not mean that no remedy should be afforded
 
 
 [6]
 In a case relied upon by the District Court and by the principal opinion, Bell v. Board of Education, Akron Public Schools, 683 F.2d 963 (6th Cir.1982), the Sixth Circuit refused to accept that an otherwise innocent school district could be made to participate in a remedy for the discriminatory housing practices of other governmental agencies. Id. at 968. I find this portion of Bell irreconcilable with the principles enunciated by the Supreme Court in Milliken, as well as with this Court's Morrilton opinion
 
 
 [7]
 The District Court did not base its award of intradistrict relief against the State on these housing violations, since it found a "more salient reason," 593 F.Supp. at 1503, for State intradistrict liability in the State's failure to dismantle the dual school system it had created within the KCMSD. Id. at 1503-1504. The issue here, however, is whether interdistrict relief is warranted, an issue the District Court did not speak to in its evaluation of state housing discrimination
 
 
 [8]
 Missouri's state legislature established the LCRA in 1953 and gave it, subject to the approval of Kansas City's government, citywide jurisdiction to administer urban-renewal programs. Secs. 99.320(1), 99.330 R.S.Mo. The HAKC was created by the state legislature in 1939 and, subject to Kansas City's approval, given authority to administer low-income housing programs throughout the City. Sec. 99.040 R.S.Mo
 
 
 [9]
 I would require the District Court to make findings on these points on remand
 
 
 [10]
 I note at this juncture several concerns I have over the District Court's analysis of the claims against FHA and HUD
 From the mid-1930s through 1947, the FHA's appraisal manuals stressed the desirability of racial covenants, limited availability of mortgage insurance for developments not subject to racial covenants, and down-graded appraisals in neighborhoods undergoing integration. After 1947, the FHA removed explicit racial references from its manuals, but continued to emphasize in them the importance of "social homogeneity" and "compatibility among the neighborhood occupants." 593 F.Supp. at 1497; P.Ex. 1305. Although a number of other courts have noted the invidious character of these and other aspects of FHA's appraisal policies, see, e.g., Reed v. Rhodes, 607 F.2d 714, 729 (6th Cir.1979), cert. denied, 445 U.S. 935, 100 S.Ct. 1329, 63 L.Ed.2d 770 (1980); Oliver v. Kalamazoo Board of Education, 368 F.Supp. 143, 182-183 (W.D.Mich.1973), aff'd, 508 F.2d 178 (6th Cir.1974), cert. denied, 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975), the District Court exonerated the FHA, reasoning that the FHA was merely gauging the economic realities associated with racial discrimination. 593 F.Supp. at 1497. I believe that in so holding the District Court overlooked the fact that FHA was not merely an uninvolved observer, but was rather an active participant in the housing market whose policies and practices had a significant impact on the market. FHA practices set a standard followed by other lenders and complied with by real estate developers who wished their developments to be eligible for FHA-insured financing, even if some units were not ultimately financed through the FHA. The FHA not only gave private discrimination consideration in its own conduct, but also encouraged others to engage in discrimination; this government cannot lawfully do.
 The District Court's finding that FHA's policies and practices have no significant current effect may be similarly vulnerable. The Court based its conclusion on the fact that prior to 1950 FHA insured 15,000 homes in the KCMSD, and between 1950 and 1980 there were over 2,000,000 housing turnovers in the area. 593 F.Supp. at 1497. But the FHA's practices may have affected far more homes than were actually financed through the FHA.
 With regard to HUD, the District Court found that the agency had acted "reasonably" because it had taken action in the 1970s to end discriminatory practices by HAKC, whose programs HUD funded. 593 F.Supp. 1498-1499. Yet there was extensive evidence, not addressed by the District Court, that HUD knew of shortcomings in HAKC's tenant-assignment practices for years without taking action to end them.
 In view of the fact that, under the prevailing view in this Court, there will be no remand for further fact-finding on the effects of housing discrimination, I do not pursue further this line of argument. Under my view (shared in part by three other judges), there would be such a remand, and in that event it would be open to the District Court to reconsider its findings as to HUD and FHA and, if appropriate, bring them back in as participants in an interdistrict remedy.
 
 
 [11]
 However, I note with regard to the latter basis of State liability that the District Court stated, "To the extent, if any, that the racial composition of the KCMSD is the result of steering and blockbusting practices by private real estage agents ... the Court finds that these actions of private individual real estate agents are not actions of the KCMSD or any SSD." Opinion of June 5 at 41. This reinforces my conclusion that the District Court has left open the question whether State-fostered private discrimination in the housing area has current interdistrict segregative effects
 
 
 [1]
 Cf. T.H. Huxley, Lay Sermons, Addresses, and Reviews (1891) ("A world of fact lies outside and beyond the world of words")
 
 
 [2]
 For the history of this circuit's school desegregation rulings, see Heaney, Busing, Timetables, Goals, and Ratios: Touchstones of Equal Opportunity, 69 Minn.L.Rev. 735 (1985)
 
 
 [3]
 The lead opinion's reliance on Anderson v. City of Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985), provides the basis of its criticism that this dissent "engag[es] in an original evaluation of the voluminous and ofttimes contradictory record seeking an ultimate conclusion more satisfactory than that reached by the district court." Ante at 668. It suggests that this dissent "embarks upon fact finding of [its] own" and makes "no effort to consider [the district court's finding] in a proper Rule 52(a) analysis." Ante at 677 n. 25. It also urges that the dissent "completely and totally ignores the district court's findings that any pre-1954 acts had negligible and de minimis current effects." Ante at 680 n. 28
 I start with the legal premise, never refuted by the lead opinion, that the district court's opinion is fundamentally unsound because it is based on an erroneous legal premise in its interpretation of Milliken and because it totally ignores the historical and factual record. Not only is the record contradictory, as the lead opinion admits, but in its own opinions the district court contradicts itself. This dissent does not substitute the views of appellate judges for that of the trial court. What this dissent focuses on is that the district court's application of the law to its findings is erroneous, a conclusion to which the clearly erroneous standard does not even apply. It is not a duplication of the district court's role when on review an appellate court identifies errors in the district court's reasoning. In Anderson, the Supreme Court made it clear that to uphold a district court's findings as not clearly erroneous, the district court's account of the evidence in making those findings must be plausible in light of the record viewed in its entirety. See Anderson, 470 U.S. at 573-74, 105 S.Ct. at 1511-12. Anderson does not hold that a trial court's factfinding power is limitless, nor that appellate review is nothing more than a rubber stamp of the district court's actions.
 Moreover, the lead opinion states that the Jenkins class and the KCMSD did not argue that the district court's findings are clearly erroneous. This assertion too conveniently seeks to avoid the legal arguments made by the appellants that the district court formulated conclusions which were incorrectly based upon erroneous legal premises. See Reply and Response Brief of Appellant/Cross-Appellee Kansas City, Missouri School District at 14-24.
 
 
 [4]
 The district court's fundamental misconstruction of Milliken is illustrated by the following transcript excerpts of statements made by the district judge at trial:
 As I read Milliken and its progeny, the constitutional violation must have occurred in one of the suburban districts.... Now, that's Milliken, as I read it. And 80 percent of [the plaintiffs'] proof in this case so far would not comport with Milliken. Now, if I'm reading Milliken wrong, then I'm reading it wrong. Tr. 7342-43.
 But I was bound by law, as I read it [when dismissing the SSDs], that you cannot require an entity to be part of the [interdistrict] remedy unless you found a constitutional violation on the part of that entity * * *. Tr. 24, 561-62.
 In its June 5, 1984 opinion, the district court further stated:
 Because each defendant district is independent and autonomous from the state of Missouri, and from all other school districts, none has an affirmative duty to merge with other districts. None can be held vicariously liable for the acts of the state, federal government or other entities. And, absent a finding of an interdistrict constitutional violation, none can be made a part of an interdistrict remedy.
 * * *
 Instead, plaintiffs had to prove first that the segregated schools existing before 1954 were the direct and substantial cause of blacks leaving each defendant district; second, assuming that occurred, that it had a significant segregative effect in the KCMSD. See, 418 U.S. at 744-45, [94 S.Ct. at 3127]; Lee, 639 F.2d at 1256 ("there must be clear proof of cause and effect and a careful delineation of the extent of the effect"). Plaintiffs' proof was weak, speculative and in any event de minimus [sic].
 Jenkins v. State of Mo., No. 77-0420-CV-W-4, slip op. at 12 (W.D.Mo. June 5, 1984).
 Even accepting Dr. Kain's conclusion that the present racial segregation is due to discrimination, Dr. Kain offered no evidence or opinions tending to show that any actions or inactions of any SSD contributed in any significant way to causing the racial residential separation he described. The Court finds that none of the SSDs did or failed to do anything which had any significant effect on residential patterns in the Kansas City SMSA. His testimony, therefore, does not support plaintiffs' claims for relief against the SSDs.
 Jenkins, June 5 opinion at 36.
 Again, in an order issued in January, 1985, the district court stated:
 It would be very beneficial in the event the Eighth Circuit Court of Appeals were to reverse this Court's dismissal of the suburban districts. It would be useful in any effort undertaken to seek voluntary consolidation between any or all of the school districts. However, because of restrictions on this Court's remedial powers in restructuring the operations of local and state government entities, that portion of the KCMSD plan which would require the consolidation of eleven suburban school districts with KCMSD goes far beyond the nature and extent of the constitutional violation this Court found existed. See, Order filed September 17, 1984. This Court found that there was no unconstitutional action on the part of any of the eleven suburban school districts nor was there evidence of constitutional violations by those school districts which had any significant segregative effect within their own districts or on the KCMSD. Milliken v. Bradley, 418 U.S. 717, 745-48 [94 S.Ct. 3112, 3127-29, 41 L.Ed.2d 1069] (1974) (where respondents, alleging the Detroit school system was racially segregated, sought the creation of a unified school district as a remedy without a finding of constitutional violations by the suburban districts and without finding significant segregative effects). "The Supreme Court in Hills v. Gautreaux, [425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976) ] has interpreted Milliken I to mean that district courts may not restructure or coerce local governments or their subdivisions." Liddell v. State of Missouri, 731 F.2d 1294, 1308 (8th Cir.1984). Clearly a plan which would require the consolidation of suburban school districts, ones in which no constitutional violation or significant segregative effect has been found, results in a restructuring and coercion of local government which is prohibited under Milliken I.
 Jenkins v. State of Mo., No. 77-0420-CV-W-4, slip op. at 2 (W.D.Mo. January 25, 1985).
 
 
 [5]
 In its brief on appeal, the state notes:
 Thus, in any case in which a state school system exhibits a large measure of local control, Milliken I requires that parties seeking an interdistrict remedy prove either (a) that the school district boundaries were manipulated for racial reasons or (b) that some intentionally discriminatory action by the governmental defendants--the State or the local school districts--was a "substantial cause" of "significant" current interdistrict segregation. Id.; see Hills v. Gautreaux, 425 U.S. 284, 294 & n. 11 [96 S.Ct. 1538, 1545 & n. 11, 47 L.Ed.2d 792] (1976) [Hills ] (Milliken I requires demonstration of "significant" interdistrict segregative effects caused by unlawful governmental act); Lee v. Lee County Board of Education, 639 F.2d 1243, 1254-56 (5th Cir.1981).
 Brief of State Appellees/Cross-Appellants at 10.
 
 
 [6]
 Judge Heaney, who authored the Morrilton opinion, now joins in this opinion's specific conclusion that Morrilton was never intended to be limited to gerrymandered boundaries. Moreover, this court's reliance in Morrilton on Board of School Comm'rs. clearly refutes the lead opinion's position. In Morrilton, we adopted wholly the language of the Seventh Circuit, which states:
 [S]chool officials may not maintain that their districts should be excluded from any interdistrict remedy if they are found innocent of committing any constitutional violations because they should not be held responsible for the acts of the state legislators or other state subdivisions such as a local housing authority or a zoning board. The commands of the Fourteenth Amendment are directed at the state and cannot be avoided by a fragmentation of responsibility among various agents. * * * If the state has contributed to the separation of the races, it has the obligation to remedy the constitutional violations. That remedy may include school districts which are its instrumentalities and which were the product of the violation.
 Board of School Comm'rs., 573 F.2d at 410 (quoted in Morrilton, 606 F.2d at 228-29) (emphasis added) (citation omitted). The lead opinion attempts to distinguish this language from Board of School Comm'rs. by asserting that the school districts in that case were "mere instrumentalities of the state." Ante at 673. As grounds for its conclusion that the SSDs are "independent and their boundaries must be respected," the district court stated that "to find the SSDs vicariously liable for acts of the state, the Court must make the threshhold determination that the SSDs are mere agents or arms of the state and not independent, locally autonomous entities." Jenkins, June 5 opinion at 101-02. See also id. at 8-14. Not only does the lead opinion's statement reflect the district court's misconstruction of Milliken, but it overlooks the fact that an SSD may have some attributes of autonomy and yet remain an instrumentality of the state.
 In its June 5 opinion, the district court found that the SSDs had more attributes of autonomy than those Michigan school districts examined in Milliken. Jenkins, June 5 opinion at 8. While it is true that the SSDs may have some authority to act independently, that authority is delegated to them by the state and the state retains ultimate authority over the SSDs' actions. The SSDs exist pursuant to provisions of the Missouri constitution, are maintained at the pleasure of the Missouri legislature, and are subject to the authority of state statutes and the rules and regulations of the Missouri State Board of Education. See, e.g., Mo. Const. arts. III, Sec. 40(20); IX. Evidence introduced at trial acknowledged the authority of the Missouri General Assembly to reorganize Missouri's schools for the purpose of achieving racial balance. See, e.g., Plaintiffs' Exhibit 1010. The Missouri Supreme Court has found that school districts "form an integral part of the state, and constitute that arm or instrumentality thereof discharging the constitutionally [e]ntrusted governmental function of imparting knowledge and intelligence to the youth of the state," School Dist. v. School Dist., 340 Mo. 779, 102 S.W.2d 909, 910 (1937), and that the school districts are statutory trustees for the discharge of the governmental function to apportion funds in the best interests of education which by the constitution is entrusted to the state, School Dist. No. 59 v. Maple Grove School Dist. No. 56, 359 S.W.2d 743, 747-48 (Mo.1962) (citing School Dist. v. School Dist.). Moreover, the district court explicitly concluded in its September opinion that "none of the provisions of the Constitution nor statutes of the State of Missouri would have prevented the State of Missouri from fulfilling its affirmative duty of disestablishing a dual school system subsequent to 1954." Jenkins v. State of Mo., 593 F.Supp. 1485, 1504 (W.D.Mo.1984). The court further concluded that "[i]t is clear that school districts in the State exist pursuant to the State Constitution," id., and that "[t]he State executive and its agencies as well as the State's General Assembly had and continue to have the constitutional obligation to affirmatively dismantle any system of de jure discrimination, root and branch," id. at 1505.
 
 
 [7]
 This court's line of cases interpreting and applying the Milliken standard to encompass a wide range of constitutional violations is consistent with Justice Stewart's restatement of the Supreme Court's holding in his concurring opinion in Milliken, in which he stated:
 Since the mere fact of different racial composition in contiguous districts does not itself imply or constitute a violation of the Equal Protection Clause in the absence of a showing that such disparity was imposed, fostered, or encouraged by the State or its political subdivisions, it follows that no inter-district violation was shown in this case.
 Milliken, 418 U.S. at 756, 94 S.Ct. at 3133 (Stewart, J., concurring) (emphasis added). Justice Stewart further emphasized that
 [t]he Constitution simply does not allow federal courts to attempt to change that situation unless and until it is shown that the State, or its political subdivisions, have contributed to cause the situation to exist. No record has been made in this case showing that the racial composition of the Detroit school population or that residential patterns within Detroit and in the surrounding areas were in any significant measure caused by governmental activity, and it follows that the situation over which my dissenting Brothers express concern cannot serve as the predicate for the remedy adopted by the District Court and approved by the Court of Appeals.
 Id. at 756 n. 2, 94 S.Ct. at 3133 n. 2 (emphasis added). Nowhere does Justice Stewart limit the definition of unconstitutional governmental activity solely to instances of gerrymandering.
 
 
 [8]
 Under Missouri law, the SSDs are legally responsible for the constitutional violations of their predecessor districts. See Lewis County C-I School Dist. v. Normile, 431 S.W.2d 118, 121 (Mo.1968) (en banc); McClure v. Princeton Re-organized School Dist., 307 S.W.2d 726, 727-28 (Mo.Ct.App.1975); Lynch v. Webb City School Dist. No. 92, 373 S.W.2d 193, 200 (Mo.Ct.App.1963). See also Taylor v. Board of Educ., 294 F.2d 36, 38-39 (2d Cir.1961), cert. denied, 368 U.S. 940, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961) (school board at time of litigation held liable for the discriminatory acts of predecessor boards. Any reference to the conduct of an SSD therefore includes liability for any acts of its predecessors
 
 
 [9]
 The district court found that four of the SSDs--Center, Raytown, Grandview, and Hickman Mills--did not operate dual school systems because they had no black residents prior to 1954. However, this finding is highly questionable, especially as to Raytown, Grandview, and Hickman Mills, in light of the school records and other evidence before the district court which showed the presence of at least some black children in their predecessor districts. In any event, that no black children may have lived in these districts prior to 1954 does not exculpate these districts. The great weight of evidence at trial indicated that the fact that there were no schools for black children to attend in these SSDs deterred blacks from moving to those districts in the first place. See, e.g., Jenkins, 593 F.Supp. at 1490; testimony of Dr. James D. Anderson, an expert in the field of the history of American education, summarized in Brief of Amicus Curiae The Kansas City Branch of The National Association for the Advancement of Colored People at 3-8
 
 
 [10]
 This attempt to separate constitutional violations related to housing and the segregative policies of the various school districts ignores the district court's undisputed finding of the "inextricable connection between schools and housing." Jenkins, 593 F.Supp. at 1491. The constitutional violations here are so intertwined that it is impossible to separate the effects of one from another
 
 
 [11]
 But see this dissent's footnote 6, supra, criticizing the lead opinion's conclusion that the SSDs are not instrumentalities of the State of Missouri
 
 
 [12]
 Because Missouri mandated separate schools for blacks and whites until 1954, the current disparity between the percentage of blacks attending school in the SSDs and KCMSD should raise a rebuttable presumption that the de facto segregation that currently exists is the result of the prior constitutional violations. See Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 26, 91 S.Ct. 1267, 1281, 28 L.Ed.2d 554 (1971). The lead opinion argues that the Swann presumption that proof of prior de jure segregation coupled with a continuing racial imbalance establishes liability unless rebutted is inapplicable in interdistrict cases. To support this conclusion, the lead opinion notes that the Supreme Court did not apply the Swann presumption in Milliken. Ante at 670. Unlike this case, however, there was no allegation nor proof in Milliken that prior de jure segregation had interdistrict effects. In any event, even if the Swann presumption does not apply to interdistrict cases, the plaintiffs presented sufficient evidence that the constitutional violation of the SSDs have current interdistrict effects
 
 
 [13]
 Other examples of KCMSD's segregative policies include the transfer of its best and most experienced black teachers to white schools, leaving less capable teachers in black and changing schools and accelerating those schools' transition to all-black schools. Too, as the district court found, the liberal transfer policy allowed "whites living in racially transitional neighborhoods in Kansas City to transfer * * * to whiter schools." Jenkins, 593 F.Supp. at 1493
 
 
 [14]
 The lead opinion asserts that this statement is an example of "appellate factfinding." To the contrary, this statement is based on the district court's own observations as to what actually occurred in the Kansas City metropolitan area due to institutional segregation. See Jenkins, 593 F.Supp. at 1493-94
 
 
 [15]
 It is conceivable that the district court found nothing inconsistent in so holding, because it labored throughout these proceedings under the miscomprehension that Milliken requires each individual SSD to be a constitutional violator. The lead opinion now urges that the August 25, 1986 opinion was merely a general order which does not contradict the district court's earlier, more lengthy orders. Ante at 671 n. 17. This statement is at odds not only with the August order's plain language, but also with the objections to that August order made to this court by the SSDs on the grounds that the order was entered after the SSDs were no longer parties to the case and that its language was prejudicial to them
 
 
 [16]
 See infra note 18
 
 
 [17]
 The court also erred in rejecting much of the plaintiffs otherwise uncontroverted expert testimony regarding the effect of defendants' constitutional violations on the residential choices of blacks in the Kansas City metropolitan area. Much of this testimony, given by Dr. James D. Anderson, a leading scholar and historian, was uncontradicted and based on interpretation of public records. See supra note 9. This evidence was highly probative, and it was wholly arbitrary for the court to reject it and inject its own inferences. Moreover, it is especially crucial in a case of this nature to give great consideration to the testimony of historical experts where the theory to be proved occurred long ago and few witnesses are alive to testify
 
 
 [18]
 See, e.g., 1929 Report of Missouri State Superintendent of Public Schools at 122-23 ("high school opportunity for [N]egro children is very limited" other than in St. Louis and Kansas City; "84 percent of all the high school education in the state" for blacks is provided in these cities although "less than half the [N]egro population in the state" lives there; in light of poor education for blacks in areas outside the cities, "the pronounced drift of the [N]egro population away from the farm to the city is quite understandable"); 1924 Report at 197 ("[m]any [blacks in rural areas] leave to seek better educational facilities for their children")
 
 
 [19]
 The lead opinion's implication that interdistrict relief here would trigger white flight to Kansas, ante at 686, is irrelevant in determining whether interdistrict relief is appropriate. See, e.g., United States v. Board of School Comm'rs., 503 F.2d 68, 80 (7th Cir.1974) (Seventh Circuit reversed district court order for interdistrict relief, but found prediction of "white flight" an unacceptable reason for failing to desegregate schools)
 
 
 [20]
 As we observed in Little Rock, in Milliken it was proposed that the remedy include consolidation of one city district with fifty-three suburban districts in three counties where there was no evidence in the record indicating that the fifty-four districts were closely interrelated geographically, economically, politically or culturally as are the districts in this case. Little Rock, 778 F.2d at 429
 
 
 [21]
 Although for the reasons stated herein we stand in dissent, we nonetheless agree with Judge Ross' statement as to the likely effects of refusal by the Kansas City metropolitan school districts to participate now or in the future in any cross-district programs